1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

8
9

10 | **BRIAN TINGLEY**,          )    Case No. <u>3:21-cv-5359</u>

11 |       Plaintiff,          )

12 |    v.                    )    **VERIFIED COMPLAINT FOR**

13 | **ROBERT W. FERGUSON**, in his official

**DECLARATORY AND**
**INJUNCTIVE RELIEF**

capacity as Attorney General for the State
of Washington; **UMAIR A. SHAH**, in his
official capacity as Secretary of Health for
the State of Washington; and **KRISTIN**
**PETERSON** in her official capacity as
Assistant Secretary of the Health Systems
Quality Assurance division of the
Washington State Department of Health,

      Defendants.

14
15
16
17
18
19
20
21
22
23
24
25
26
27

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

Table of Contents

I.     JURISDICTION AND VENUE ........................................................ 3

II.    PARTIES ............................................................................................ 4

       A.     Plaintiff ................................................................................. 4

       B.     Defendants ........................................................................... 5

III.   FACTUAL BACKGROUND ........................................................... 7

       A.     The Counseling Censorship Law .................................... 7

       B.     The Plaintiff's clients and his practice ........................ 13

       C.     Plaintiff's counseling relating to gender identity ...... 15

       D.     Counseling and change relating to sexual attractions ......... 26

       E.     Plaintiff's counseling relating to sexual "behaviors" ........... 38

       F.     The impact of the Counseling Censorship Law on the Plaintiff's
              practice and clients ......................................................... 40

COUNT I .................................................................................................. 43

COUNT II ................................................................................................. 46

COUNT III ............................................................................................... 48

COUNT IV ................................................................................................ 54

COUNT V ................................................................................................. 56

PRAYER FOR RELIEF ......................................................................... 57

Plaintiff's Verified Complaint
Case No. _____

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

# INTRODUCTION

1.      Plaintiff Brian Tingley is a licensed Marriage and Family Therapist practicing in Fircrest, Washington. For over twenty years, Mr. Tingley's clients have looked to him for support in pursuing meaningful and positive change in their lives.

2.      Plaintiff finds great fulfillment in working with clients to identify their objectives and encouraging them to achieve the goals that they set for themselves, consistent with their own moral values and religious beliefs. In close relationships built on a strong foundation of trust and openness, Plaintiff has seen adults, couples, teenagers, and children achieve great improvements in relationships as well as in personal stability and happiness simply by talking through the personal challenges that they face.

3.      Plaintiff works with couples, individual adults, family groups, and individual children and teenagers, depending on the need. Among the wide range of issues that Plaintiff addresses from time to time with minor clients are issues relating to gender and sexual attractions and behaviors. Needless to say, these are among the most sensitive and private conversations possible.

4.      Yet in passing Senate Bill 5722, codified at Wash. Rev. Code §§ 18.130.020 and 18.130.180 (the "Counseling Censorship Law," or "the Law"), Washington State seeks to insert itself into the privacy of Plaintiff's counseling room and censor his discussion and exploration of certain ideas with his young clients. The Law threatens severe sanctions—including substantial fines, suspension from practice, and even loss of his license and livelihood—if Plaintiff speaks ideas, and assists his clients towards goals, of which the State disapproves.

5.      Through the Counseling Censorship Law, Washington State seeks to impose uniformity and silence dissent on topics about which both clients and

Plaintiff's Verified Complaint
Case No. _____

1

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

counselors hold differing views motivated by ideology, faith beliefs, and differing interpretations of science.

6.      Specifically, the Counseling Censorship Law prohibits—in vague and expansive terms—any conversation or exchange of ideas between a counselor and his minor client in pursuit of a goal to "change" that young person's gender identity or sexual attractions, orientation, or behaviors.

7.      The Law is not aimed at any particular practices. Amendments to limit the law to physically abusive practices were rejected. Instead, and by design, the Law sweeps in even simple conversation, within a voluntary counseling relationship between a minor client and his chosen counselor, in pursuit of personal goals set by the client.

8.      Worse, the Counseling Censorship Law intrudes and censors with a decidedly biased and unbalanced hand.

9.      For a minor client who seeks the assistance of a counselor to pursue a personally chosen goal of achieving comfort with a gender identity congruent with the client's biological sex, or a goal of reducing same-sex attraction and increasing sexual attraction to the opposite sex, the Law steps in to deny that young person the professional help that he or she desires.

10.     For a minor client of faith who seeks the assistance of a counselor who shares his faith, to help him align his thoughts and his conduct with the teachings of his faith, the Law again says "No," denying that young person professional help towards his goal.

11.     Meanwhile, however, the Law imposes no barrier to a counselor supporting a client in "exploring" or "developing" any other sort of gender or sexual identity—or even guiding a minor towards permanently sterilizing treatments and procedures to alter that young person's body to more closely match a perceived gender identity.

12.     In short, through the Counseling Censorship Law, the State of Washington seeks to impose its own new orthodoxy concerning sexual morality, human nature, personal identity, and free will. And it seeks to do all this at expense of the freedom, beliefs, and even religious convictions of both counselors and clients.

13.     But our Constitution does not permit government to impose any orthodoxy in thought, belief, or speech. The First Amendment and Fourteenth Amendment strongly protect the rights of both counselors and clients to speak freely between themselves on any topic, in pursuit of any personal goal, and guided by any religious or moral convictions.

14.     Under our system, the government has no power to censor ideas and speech with which it disagrees, even if it believes those ideas to be wrong, offensive, and potentially harmful.

15.     As a result, the Washington State Counseling Censorship Law is unconstitutional and unenforceable in its entirety.

16.     Because the Law violates the rights of Plaintiff Brian Tingley and of his clients, and because it threatens Plaintiff with the loss of his livelihood, Plaintiff brings this lawsuit to obtain a declaration that the Counseling Censorship Law is unconstitutional both on its face and as applied, and to enjoin its enforcement.

## I.     JURISDICTION AND VENUE

17.     This civil rights action pursuant to 42 U.S.C. § 1983 raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments.

18.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

19.     This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested

1    injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; and

2    costs and attorneys' fees under 42 U.S.C. §1988.

3        20.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a

4    substantial part of the events or omissions giving rise to the claims occurred in this

5    District and the Defendants are located in relevant part in this District.

## II.    PARTIES

A.    Plaintiff

21.    **Plaintiff Brian Tingley** is a licensed Marriage and Family Therapist

in the State of Washington. He resides in Tacoma, Washington and practices in

Fircrest, Washington.

22.    Mr. Tingley obtained his Master of Science in Marriage and Family

Therapy from Seattle Pacific University in 2001, and has gained 20 years of

experience in active practice since that time. Previously, he had an award-winning

career in video and news production for local network affiliates, during which he

took on many assignments focusing on the needs of youth, family, and the

community.

23.    Mr. Tingley is an Approved Supervisor by the State of Washington and

the American Association for Marriage and Family Therapy, as well as a Clinical

Fellow Member of the American Association for Marriage and Family Therapy. He

has maintained a private practice of counseling since 2002, working with

adolescents, adults, and couples on a wide variety of matters. He also has

experience in crisis intervention and has worked alongside child protective services

and law enforcement where children have been placed in protective custody.

24.    Mr. Tingley has taught college courses in Psychology and Human

Relations, and has facilitated training seminars and workshops at the request of

local therapist groups.

Plaintiff's Verified Complaint
Case No. _____

4

25.     He has provided both in-person and written testimony to the Washington State Legislature on issues pertaining to teenage sexuality and identity on several occasions, including in connection with the bill that was ultimately passed as the Counseling Censorship Law.

26.     Mr. Tingley is a committed Christian who also has theological training, having received a Diploma in Ministry and Biblical Studies in 1984. He is regularly asked to provide seminars and workshops to local churches on challenges facing children and families that take into account a biblical perspective as well as his professional expertise.

27.     While Mr. Tingley does not impose his Christian faith on anyone, his faith informs his views concerning human nature, healthy relationships, and what paths and ways of thinking will enable his clients to achieve comfort with themselves and live happy and satisfied lives.

28.     Mr. Tingley works with both Christian and non-Christian clients, and he approaches counseling of any clients who choose his services in a consistent way. However, many of his clients are referred to him by local churches, and the majority of his clients share his Christian faith.

B.     Defendants

29.     **Defendant Umair A. Shah** is the Secretary of Health for the State of Washington, having been appointed by Governor Jay Inslee on December 21, 2020.

30.     By virtue of his position as Secretary of Health, Dr. Shah has jurisdiction and disciplinary authority over a number of licensed professions pursuant to Wash. Rev. Code ("RCW") § 18.130, including licensed marriage and family therapists under RCW § 18.130.040 (2)(a)(x).

31.     Dr. Shah is authorized under RCW § 18.130.050 to "investigate all complaints or reports of unprofessional conduct" and to conduct any associated hearings. He is further authorized under RCW § 18.130.185 to bring an action

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

against any regulated professional to enjoin him or her from violating the Counseling Censorship Law.

32. Dr. Shah is named in his official capacity only.

33. **Defendant Kristin Peterson** is the Assistant Secretary of the Health Systems Quality Assurance division of the Washington State Department of Health.

34. Under the direction of Ms. Peterson, the Health Systems Quality Assurance team within the Department of Health claims the right to investigate and prosecute complaints against healthcare providers licensed by the State of Washington further to RCW § 18.130.[1]

35. Complaints against healthcare providers and facilities in the State of Washington are to be directed to the Health Systems Quality Assurance group, which considers the substance of the complaint and determines what action is to be taken.

36. Ms. Peterson is named in her official capacity only.

37. **Defendant Robert W. Ferguson** is the Attorney General for the State of Washington.

38. As Attorney General, Mr. Ferguson is the first person identified by RCW § 18.130.185 as authorized to bring an enforcement action to enjoin a person from violating the Counseling Censorship Law.

39. On information and belief, the Attorney General works with the Health Systems Quality Assurance team to identify potential violations and evaluate evidence concerning alleged violations of the Counseling Censorship Law.[2]

---

[1] Health Systems Quality Assurance, WASHINGTON STATE DEPARTMENT OF HEALTH, https://www.doh.wa.gov/AboutUs/ProgramsandServices/HealthSystemsQualityAssurance (last visited April 29, 2021).

[2] Health Professions Complaints Process, WASHINGTON STATE DEPARTMENT OF HEALTH, https://www.doh.wa.gov/LicensesPermitsandCertificates/FileComplaintAboutProviderorFacility/HealthProfessionsComplaintProcess (last visited April 29, 2021).

Plaintiff's Verified Complaint
Case No. _____

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

40.     Mr. Ferguson is named in his official capacity only.

### III.     FACTUAL BACKGROUND

A.     <u>The Counseling Censorship Law</u>

41.     In March 2018, Washington Governor Jay Inslee signed Senate Bill 5722 into law, which came into effect on June 7, 2018, and was codified at RCW § 18.130.020 and 18.130.180.

42.     The Counseling Censorship Law added "performing conversion therapy on a client under age eighteen" to the list of conduct, acts, or conditions that would constitute "unprofessional conduct" for a "license holder."

43.     Marriage and Family Therapists are among those deemed to be covered "license holders" under the definitions outlined in RCW § 18.120.020.

44.     "Conversion therapy" is defined in terms that are vague, content-based, and biased against one perspective or point of view:

"Conversion Therapy" means a regime that seeks to change an individual's sexual orientation or gender identity. The term includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex. The term includes, but is not limited to, practices commonly referred to as "reparative therapy."

"Conversion therapy" does not include counseling or psychotherapies that provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development that do not seek to change sexual orientation or gender identity."

45.     The Counseling Censorship Law provides no definitions of the terms "gender identity", "gender expressions", "identity exploration", and "identity development." It provides no information at all as to what "behaviors" a therapist may not help a client attempt to change.

46.     The Law provides no explanation on how an individual can engage in "exploration and development" relating to sexual orientation or gender identity

Plaintiff's Verified Complaint
Case No. _____

7

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1  without undergoing "change," or where the boundary between "exploration and
2  development" and "change" might be.

3    47.    The Law does not state whether the violative intent to "seek" change is
4  the intent of the therapist, or the client, or both.

5    48.    The Law contains no language concerning "sexual or romantic
6  attractions or feelings towards individuals" of the opposite sex.

7    49.    The prohibitions of the Counseling Censorship Law seek to enforce the
8  Washington legislature's particular viewpoint concerning human sexuality,
9  identity, and morality. Under this view, feelings of identification with the opposite
10  sex, or sexual or romantic attractions or feelings toward individuals of the same sex,
11  are the highest value, and must only be "affirmed," regardless of the wishes,
12  personal life goals, and religious beliefs of the individual affected.

13    50.    It is well known that many religious faiths have for countless
14  generations taught a different view concerning sexual morality and the proper place
15  of sexuality in relation to one's identity, conduct, and relationships. Nevertheless,
16  the Counseling Censorship Law contains no meaningful religious exemption to
17  protect the freedoms of counselors and clients to hold, speak and act on such faith-
18  based views of human nature, healthy relationships, and morality.

19    51.    Instead, the Counseling Censorship Law provides a sham exemption
20  that is in fact no exemption at all. The Counseling Censorship Law states that it
21  does not apply to "religious practices or counseling under the auspices of a religious
22  denomination, church, or organization that do not constitute performing conversion
23  therapy by licensed health care providers on clients under age eighteen." However,
24  as the Counseling Censorship Law prohibits nothing *except* "performing conversion
25  therapy by licensed health care providers on clients under age eighteen," this does
26  not exempt religious providers and clients from anything at all. Instead, it
27  indirectly asserts the right and power to prohibit even "religious . . . counseling" by

a license holder "under the auspices of a . . . church," if the counsel that is given disagrees with the viewpoint enshrined in the Counseling Censorship Law.

52.   Similarly, the Counseling Censorship Law states that it does not apply to "nonlicensed counselors acting under the auspices of a religious denomination, church, or organization." But this again is a sham and empty exception, since the Law never applies to "nonlicensed counselors," whether religious or not.

53.   The Counseling Censorship Law threatens severe sanctions against any therapist or counselor found to have violated its vague and viewpoint-based prohibitions. It threatens these penalties based on nothing more than private conversations and counsel that is desired by clients and their parents.

54.   As stipulated in RCW § 18.130, in the event of a violation of the Counseling Censorship Law, the Secretary "must" impose one of a number of sanctions listed in RCW § 18.130.160 that range from "censure or reprimand," to fines of $5,000 for each violation, to permanent revocation of the professional's license—destroying that professional's very means of earning a living and supporting a family.

55.   Further, the Law authorizes not just the Secretary or responsible disciplinary bodies, but "any other person" to file a lawsuit accusing a counselor or therapist of violating the Counseling Censorship Law, RCW § 18.130.185, exposing professionals who do not agree with the State's approved viewpoint on these matters of sexuality and identity to harassment and attack by private activists.

56.   Restrictions on so-called "conversion therapy" are often justified by claims that unscrupulous practitioners have resorted to electroshock therapy or physical restraint, and the bill's primary sponsor Senator Liias asserted that the law is directed against "barbaric practices." The Senate Bill Report behind SB 5722 expressed concern about supposed practices that "induce nausea, vomiting, and other responses from youth, while showing them erotic images."= No specific

Plaintiff's Verified Complaint
Case No. _____

9

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1  instances are documented in the Report. The House Report asserted that

2  problematic practices include "physical abuse of children." However, the legislative

3  record of the Counseling Censorship Law did not contain any testimony or evidence

4  that such practices have *ever* been engaged in by "license holders" in the State of

5  Washington.

6       57.    In reality, the Counseling Censorship Law is directed against specific

7  ideas and personal goals, not against specific practices. During consideration of the

8  Law, the Washington legislature rejected an amendment that would have limited

9  the proscribed conduct to "aversion therapy" that involved "electrical shock, extreme

10  temperatures, prolonged isolation, chemically induced nausea or vomiting, assault"

11  or other procedures intended to cause "pain, discomfort, or unpleasant sensations."

12       58.    Likewise, the Washington legislature rejected an amendment that

13  would have limited the definition of prohibited "conversion therapy" to mean

14  "aversive or coercive" regimes that would include physical restraints, "use of

15  pornographic material, and electroconvulsive therapy conducted outside of

16  medically accepted use."

17       59.    It is revealing to note that the Washington legislature also rejected an

18  amendment that would have specifically exempted counseling that would have been

19  "consistent with the client's affirmatively stated goals or objectives."

20       60.    Instead, Senator Liias, one of the sponsors of the bill, argued in debate

21  that in his view counseling consisting of mere talk could be "just as pernicious" as

22  abusive practices, and affirmed that the bill was directed to "use [of] words."

23       61.    This legislative history confirms that the intent of the Counseling

24  Censorship Law is to suppress ideas and advice that the government of Washington

25  State frowns on, and instead to restrict counseling in this State to viewpoints and

26  advice that reflect certain values.

27

62.     Further, it is well known to both advocates and practitioners in the field, and on information and belief, was well known to the legislative sponsors of the Counseling Censorship Law, that most of those who seek counseling to change sexual orientation are motivated by religious convictions.

63.     Thus, in 2013 the American Counseling Association issued a statement declaring that "Conversion therapy as a practice is a religious, not psychologically-based, practice.... The treatment may include techniques based in Christian faith-based methods...." In other words, according to the ACA, what the Counseling Censorship Law seeks to prohibit is "a religious . . . practice."

64.     Another of the Bill's sponsors, Senator Maureen Walsh, implicitly admitted this while advocating passage of the Bill when she denounced those who (in her words) might seek to "pray the gay away."

65.     The Human Rights Campaign organization, which is active nationally in promoting counseling censorship laws and ordinances, in its website accuses "right-wing religious groups" of "promot[ing] the concept that an individual can change their sexual orientation or gender identity."

66.     In a booklet published by the Human Rights Campaign and National Center for Lesbian Rights titled "Protecting our children from the harms of conversion therapy," the introduction blames "churches, synagogues, mosques and temples around the world" for telling LGBTQ people that "they are sinful," and the booklet refers to religious faith and religious leaders and institutions on almost every page.

67.     In a report published in 2009, a task force of the American Psychological Association reported that "most SOCE ["sexual orientation change efforts"] currently seem directed to those holding conservative religious and political beliefs, and recent research on SOCE includes almost exclusively individuals who have strong religious beliefs." The Task Force further reported that those who seek

Plaintiff's Verified Complaint
Case No. _____

11

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

counseling with a goal of moving away from same-sex attractions are
"predominately . . . men who are strongly religious and participate in conservative
faiths."[3]

68.    Leading authors in the field have made the same observation
repeatedly over the last two decades. In 1999, psychology professor and prominent
advocate of counseling censorship laws Douglas Haldeman wrote that "Historically,
most conversion therapy occurred in religious settings." In 2004, Prof. Haldeman
again wrote that "the vast majority of those seeking sexual orientation change
because of internal conflict have strong religious affiliations." Douglas C.
Haldeman, *When Sexual & Religious Orientation Collide: Considerations in
Working with Conflicted Same-Sex Attracted Male Clients*, 32 THE COUNSELING
PSYCHOLOGIST 691, 693 (2004). And in an important paper in 2016, internationally
prominent authors Prof. Lisa Diamond and Prof. Clifford Rosky cited multiple peer-
reviewed papers to conclude that "[T]he majority of individuals seeking to change
their sexual orientation report doing so for religious reasons rather than to escape
discrimination." Lisa M. Diamond & Clifford J. Rosky, *Scrutinizing Immutability:
Research on Sexual Orientation & U.S. Legal Advocacy for Sexual Minorities*, 52 J.
OF SEX RESEARCH, 1, 6 (2016).

69.    In sum, through the Counseling Censorship Law, the State of
Washington is not only seeking to censor and suppress ideas and personal goals
with which it disagrees; it is targeting ideas and motivations well known to be
primarily associated with and advocated by people of faith, for reasons of faith.

---

[3] American Psychological Association, *Task Force on Appropriate Therapeutic Responses to Sexual
Orientation* (2009), http://www.apa.org/pi/lgbc/publications/therapeutic-resp.html (last visited April
29, 2021).

Plaintiff's Verified Complaint
Case No. _____

12

B.    The Plaintiff's clients and his practice

70.    Plaintiff Tingley founded his own private therapy practice in 2002, and since that time has offered a wide range of therapy services to adolescents, adults, couples, and families addressing interpersonal and family conflict, communication issues, marital and post-divorce issues, individual identity challenges, emotional management including depression and anxiety, anger management, and adult Attention Deficit Hyperactivity Disorder, among many other matters. The practice web page states that the practice group consists of Christian counselors, who share a goal of helping clients achieve "personal and relational growth as well as healing for the wounded spirit, soul, and body through the healthy integration of relational, psychological, and spiritual principles with clinical excellence."[4]

71.    While Plaintiff is a committed Christian, his services are available to anyone, regardless of whether they have a different faith background or no faith at all. Nevertheless, Mr. Tingley's clients are frequently referred to him by local churches, and the majority are Christians. Many of them come to Plaintiff because they desire a counselor who shares and so will understand and respect their Christian beliefs. Often, Plaintiff's clients express the belief that alignment between their actions and feelings on the one hand, and their religious convictions on the other, will be important to helping them to heal from past trauma, as well as to pursuing their personal goals and the lives that they wish to lead going forward.

72.    Plaintiff's counseling approach is to provide a safe environment for each client to allow for his or her own self exploration. Plaintiff's first priority is ensuring that he establishes trust with his clients, so that they feel safe in opening up to discuss all kinds of sensitive issues. Once rapport is established, Plaintiff can

---

[4] *See* Family Foundations Counseling, https://www.familyfoundationscounseling.com/ (last visited April 29, 2021).

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

help clients identify their own objectives and then, through discussion over time, work together to accomplish those objectives.

73.    Because Mr. Tingley is a Christian himself, he is able to engage with his Christian clients in a manner that is particularly understanding and respectful of, and informed by, shared faith convictions and the personal goals of the client that may be guided by the client's faith convictions, or by the client's desire to live a life of integrity within his or her family.

74.    Where clients have a strong faith, Mr. Tingley has recognized that it can be of particular importance to them to know that there are no unspoken concerns or suspicions about their beliefs on the part of their counselor. This is because of the central role that faith plays in their lives—touching on all aspects of their lives—as well as their prior experiences of varying degrees of opposition to their faith from those who do not share their beliefs. Consequently, in many cases he is specifically sought out by clients because they want to speak with a counselor who shares their Christian worldview about the issues that are affecting their lives.

75.    However, Plaintiff is not a pastor, and does not consider it part of his role to rebuke clients, or to tell them how they should live their lives.

76.    Working with his clients, all Mr. Tingley does is listen and talk with them. He spends time listening to their stories, their fears, and their hopes—at times probing with questions to aid their own self-discovery. Through thoughtful discussion, ideas are exchanged and positions are queried. This process allows clients to reflect on their identity and their beliefs, as well as enabling them to identify personal goals and objectives which are not immediately clear to them.

77.    Plaintiff provides counseling concerning a wide array of issues that arise in personal, marriage, and family life. Issues relating to gender identity and sexual attractions and behaviors are simply some of the many issues that clients bring into his counseling room and about which they ask his assistance.

78.   Given his expertise and his family-oriented practice, a significant part of Mr. Tingley's practice is dedicated to counseling minors. He works with minors on a wide variety of issues as they transition into adulthood, but his basic approach to them as clients remains the same.

79.   Although the wishes of the parents may often overlap with those of their children, Mr. Tingley's approach is to support the minor in his or her own personal exploration and development. As he works with the minors over the course of continued discussion, he seeks to offer them the support and encouragement that they need to achieve the goals and objectives that they set for themselves.

80.   While in most cases the minor will initially attend on the prompting of their parent or parents, Mr. Tingley will only continue to see a minor as a client if the minor is willing to work with him, and participates voluntarily.

81.   Topics about which Plaintiff has counseled minors include depression, anxiety, anger management, and other issues of emotional management. They also include concerns or confusion about gender identity, unwanted same-sex attraction, and other unwanted sexual behaviors such as addiction to pornography.

82.   In these cases, as with any other, Mr. Tingley does nothing but talk with his clients. He simply listens to what his clients say, asks them questions, and talks with them.

C.   Plaintiff's counseling relating to gender identity

83.   "Gender identity" is not defined in the Counseling Censorship Law.

84.   Gender dysphoria is defined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), in adolescents and adults, as "A marked incongruence between one's experienced/expressed gender and assigned gender [i.e., biological sex], of at least 6 months duration," along with certain other indicators, and resulting in "clinically significant distress or impairment in social, occupational, or other important areas of functioning."

Plaintiff's Verified Complaint
Case No. _____

15

85.     In recent years, rapidly increasing numbers of minors have been referred to gender clinics for diagnosis for potential gender dysphoria, with one noted clinic reporting a more than eight-fold increase between 2002 and 2013, M. Aitken et al., *Evidence for an Altered Sex Ratio in Clinic-Referred Adolescents with Gender Dysphoria*, 12 J. OF SEXUAL MEDICINE, 756, 757 (2015), and a more recent paper recognizing that "most studies" demonstrate a "clear trend" of "growth in the proportion of [transgender] self-identifying individuals over time." Ian Nolan et al., *Demographic and Temporal Trends in Transgender Identities and Gender Conforming Surgery*, 8 TRANSITIONAL ANDROLOGY AND UROLOGY, 184, 185 (2019).

86.     Nolan et al. report that transgender identification "appears to be more common among younger age groups," with noticeable geographic concentrations. In particular, a 2016 survey of 9th to 11th graders in Minnesota reported "exceptionally high rates of [transgender] identities," reaching 2,700 per 100,000 youths, or almost 3%. *Id.* at 185.

87.     Of particular concern, across the last 20 years the proportion of adolescents referred to gender clinics who are biologically female—girls—has changed rapidly, *doubling* at one clinic from about 30% during the 1999-2005 time period to more than 60% during the 2006-2013 time period. Aitkin et al. at 758. Academics and practitioners in the field have described evidence that many of these girls appear to have been strongly influenced by internet contacts, or by local friend groups. Lisa Littman, *Parent Reports of Adolescents and Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria*, 13 PLoS ONE, e0202330 (2018).

88.     Rapid changes in numbers and sex ratios of individuals reporting concerns about gender identity, as well as striking geographic variations, strongly suggest that social and cultural factors are affecting many adolescents' sense of comfort with—or distress about—their natal sex.

89.   The widely urged path of "affirming" a transgender identity for girls includes the use of puberty blockers beginning as young as eight; cross-sex hormones a few years later which build muscle mass, cause growth of facial hair and a deepened voice; "social transition" including adoption of a male name and male pronouns and dress; breast-binding to conceal their developing female biology; and ultimately double mastectomy and hysterectomy, followed by life-long administration of cross-sex hormones.

90.   Obviously "sex reassignment surgery," which removes testicles or ovaries, permanently sterilizes the affected individual. However, it is generally recognized by practitioners that cross-sex hormones, which are increasingly prescribed even for minors, may also irreversibly sterilize a child for life. A Harvard Medical School professor and her co-authors, who are active in medically transitioning minors, admit that "cross-sex hormones . . . may have irreversible effects," and describes infertility as "a side effect" of these drugs. Carly Guss et al., *Transgender and Gender Nonconforming Adolescent Care: Psychosocial and Medical Considerations*, 26 CURR. OPIN. PEDIATRICS, 421, 424-5. Another team of prominent practitioners in the field caution that there is evidence that cross-sex hormones administered to minors will permanently and irreversibly sterilize at least some of these youths, both male and female. Yet these practitioners also recognize that "research suggest[s] some of these individuals may desire genetic children as adults." Amy Tishelman et al., *Health Care Provider Perceptions of Fertility Preservation Barriers and Challenges with Transgender Patients*, 36 J. OF ASSISTED REPRODUCTION AND GENETICS, 579, 580 (2019).

91.   In addition to permanent sterilization, accepting and living in a transgender identity carries a number of known or likely lifetime costs and risks for a young person.

Plaintiff's Verified Complaint
Case No. _____

17

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

92.     Any individual whose testicles or ovaries are surgically removed through so-called "sex reassignment surgery" requires life-long medical hormonal therapy. In general, the use of cross-sex hormones, once begun, will be continued for life.

93.     As a result of chemical or surgical impacts on their sexual development and organs, some transgender adults experience diminished sexual response, and are unable ever to experience orgasm.

94.     Multiple authors have cautioned that administration of cross-sex hormones to biological males increases the individual's risk of blood clots and resulting strokes, heart attack, and lung and liver failure.

95.      It is often asserted that transgender youth attempt suicide at much higher rates than the general adolescent population. This is true. But it is not true that there is any statistically significant evidence that "affirmation" in a transgender identity substantially reduces actual suicide attempts. Instead, multiple studies report that adolescents and adults who adopt and live in a transgender identity continue to suffer severely negative mental health outcomes—including suicide and attempted suicide—throughout their lives, and this remains true even if they undergo the ultimate "gender-affirming" step of extensive surgery to reconfigure their body to conform in appearance to their desired gender identity.

96.     A long-term study in Sweden found that *after* sex-reassignment surgery transgender individuals exhibited a rate of completed suicide 19 times higher than the control group, suicide attempts at a 7.6 times higher rate, and hospitalization for any psychiatric condition at a 4.2 times higher rate. These researchers concluded that "[t]he most striking result was the high mortality rate in both male-to-females and female-to-males, compared to the general population." C. Dhejne et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6 PLoS ONE, e16885, 5-6 (2011).

97.    Similarly, a study in the United States found that the death rates of transgender-identifying veterans are comparable to those who suffer from schizophrenia and bipolar diagnoses—dying 20 years earlier on average than a comparable population.

98.    Many academics and practitioners and even transgender activists have observed that gender identity is not necessarily either binary or fixed for life. Indeed, in formally promulgating a rule in 2016, the United States Department of Health and Human Services defined "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth," and disparaged "the expectation that individuals will consistently identify with only one gender" as an inaccurate "sex stereotype." *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,376 (May 18, 2016) at 31,384 and 31,468.

99.    In addition, at least for pre-adolescents who experience gender dysphoria and receive therapeutic support but do *not* socially transition, "*every* follow-up study of GD children, without exception, found the same thing: By puberty, the majority of GD children ceased to want to transition." J. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. OF SEX &MARITAL THERAPY, 1, 1 (2019). In fact, multiple studies have documented that for pre-pubertal children who suffer from gender dysphoria, the very large majority—estimates range between 80%-98% percent—will grow into comfort with a gender identity congruent with their biological sex by young adulthood, so long as they are *not* affirmed as children in a transgender identity. S. Adelson & American Academy of Child & Adolescent Psychiatry, *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and Adolescents*, 51 J. AM. ACAD. CHILD ADOLESCENT PSYCHIATRY, 957, 963 (2012).

100.   It is not surprising, therefore, that increasing numbers of young women are speaking up who for a time transitioned to live in a male gender identity, and underwent varying degrees of hormonal and surgical "transition," but who later regretted those decisions, and reclaimed a female gender identity. These women are publicly expressing regret about the harm done to their bodies and minds, and anger against the too-hasty counsel and medical advice they received as minors which steered them into that transgender identity and those medical choices.

101.   While many of these women had previously detailed their experiences on internet blog websites pseudonymously, in recent years they have become more visible, writing under their real names, posting videos online, and forming support groups for those in similar situations.[5] In 2018, *The Atlantic* profiled several high-profile "detransitioners" who have been raising awareness of their own stories as a warning to those who are promoting or hearing only positive narratives about the impact of gender transition on affected individuals.[6]

102.   For example, Max Robinson, who has been featured at length in both *The Atlantic* and *The Economist*[7], became convinced that her internal discomfort needed to be resolved by a sex "transition" after discovering the "world of online gender-identity exploration" at age 15. A doctor prescribed cross-sex hormones for her beginning at age 16, and at age 17 she underwent a double mastectomy. While Max was initially pleased with the results, it wasn't long before she realized that

---

[5] *See* Pique Resilience Project, https://www.piqueresproject.com/ (last visited April 29, 2021); Detrans Canada, https://detranscanada.com/ (last visited April 29, 2021); and Lost in Transition, https://lostintransition.info/ (last visited April 29, 2021), among others.

[6] *See* Jesse Singal, *When Children Say They're Trans*, The Atlantic, July/August 2018, https://www.theatlantic.com/magazine/archive/2018/07/when-a-child-says-shes-trans/561749/, attached as Exhibit A.

[7] *See* Charlie McCann, *When girls won't be girls*, The Economist, Sept. 28, 2017, https://www.economist.com/1843/2017/09/28/when-girls-wont-be-girls, attached as Exhibit B.

1  she had made a mistake and began the process of "detransitioning" at age 19. She

2  lives with permanent physical changes—a deep voice, a beard, and a flat chest—

3  that cannot be reversed. *See* attached Exhibits A and B.

4      103.   Similarly, Cari Stella was prescribed cross-sex hormones by a doctor at

5  age 17, and underwent a double mastectomy at age 20. According to Cari, from the

6  time she first saw a therapist, no professional ever suggested or helped her explore

7  alternatives to a "transition."[8] Already by age 22, Cari realized that she had been

8  led into a mistake, and "detransitioned." Cari maintained a blog[9] and YouTube

9  channel[10] reflecting on her experiences, and in a video posted in 2016 said: "I'm a

10  real-live 22-year-old woman with a scarred chest and a broken voice and a 5 o'clock

11  shadow because I couldn't face the idea of growing up to be a woman."

12      104.   In the United Kingdom, 23-year-old Keira Bell successfully sued the

13  Tavistock and Portman NHS Trust—the leading British clinic responsible for

14  administering puberty blocking drugs—after her own experience culminated in the

15  realization that she had been rushed "down the wrong path."[11] As a teenager, Keira

16  went through a regimen of puberty blockers and cross-sex hormones, before

17  undergoing a double mastectomy at age 20. She initially believed that the measures

18  would help her achieve happiness, but "detransitioned" shortly after having the

19  double mastectomy. Keira has become an outspoken campaigner for reform, stating

20  that her doctors had failed her as a confused and distressed adolescent by failing to

21

22

23  [8] *See In praise of gatekeepers: An interview with a former teen client of TransActive Gender Center,* 4th Wave Now, April 21, 2016, https://4thwavenow.com/2016/04/21/in-praise-of-gatekeepers-an-interview-with-a-former-teen-client-of-transactive-gender-center/

24  [9] *See* Cari Stella, Guide on Raging Stars Blog, https://guideonragingstars.tumblr.com/ (last visited

25  April 29, 2021).

25  [10] *See* Cari Stella, YouTube, https://www.youtube.com/channel/UChCA_LScK33yNsiq0BIAa2g (last

26  visited April 29, 2021).

27  [11] *See Puberty blockers: Under-16s "unlikely to be able to give informed consent,"* BBC News, Dec. 1, 2020, https://www.bbc.com/news/uk-england-cambridgeshire-55144148.

Plaintiff's Verified Complaint
Case No. _____

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

"challenge" her oversimplified desires to be male. "I think it's up to these [medical] institutions," Keira has said, "to step in and make children reconsider what they are saying, because it is a life-altering path."

105.   Many similar stories are coming to light as more individuals realize that they are not alone in enduring these experiences.[12] It is not surprising, therefore, that increasing numbers of young people who struggle with questions of gender identity, and the parents of such young people, are aware that there are often grave and lasting costs resulting from adopting a transgender identity, and that adoption of or attraction to a transgender identity is not necessarily fixed, unchangeable, or desirable.

106.   It is also not surprising, and is entirely reasonable and legitimate, that some young people (and/or their parents) wish to explore whether it is possible for them to escape from gender dysphoria and achieve comfort with their own biological sex, so as to avoid all of these potentially severe lifetime costs of living in a transgender identity.

107.   Meanwhile, there are no statistically significant studies that demonstrate that voluntary conversational counseling which aims to help the client towards a personally chosen goal of achieving or returning to comfort with his or her own biological sex is in any way harmful to clients.

108.   Mr. Tingley has worked with minors who have expressed discomfort with their biological sex and struggled with questions and feelings around their gender identity.

109.   In one incidence since the enactment of the Counseling Censorship Law, parents brought to Plaintiff's clinic their teenage minor daughter who had

---

[12] *See* Post Trans, https://post-trans.com/ (last visited April 29, 2021), *Voices*, Sex Change Regret, https://sexchangeregret.com/voices/ (last visited April 29, 2021), among others. *See also* Abigail Shrier, *Irreversible Damage: The Transgender Craze Seducing Our Daughters,* Regnery Publishing (2020).

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

been exposed to websites advocating transgender identification for girls, and who had begun expressing unhappiness with her female gender identity, and even asserting a male gender identity. This girl had been previously diagnosed with high-functioning autism and was facing various social difficulties at school with her peers, but in earlier years had appeared comfortable in her identity as a girl.

110.    The parents were aware that gender dysphoria is often accompanied by mental health co-morbidities, that gender identity in young people is not necessarily fixed, and that long-term adoption of a transgender identity by their daughter would likely lead to sterilization, lifelong dependence on extraordinary medical care including cross-sex hormones, and an increased risk of physical, social, and mental health difficulties.

111.    The parents and child were also Christian. Contrary to basic assumptions of contemporary "gender ideology," many Christians, as well as believers in other historic religions, believe that God intended and designed humanity as "male and female," that God has created each individual as either male or female, and that obedience, well-being, and happiness lie in acceptance of and gratitude for the particular sex that God has given each individual.

112.    The parents' desire was thus to find a counselor who would assist their daughter in understanding herself and exploring the reasons for her unhappiness with her sex and identity as a girl, and hopefully enable her to return to comfort with her female body and reproductive potential, and with a gender identity as a female, girl, and in years to come, woman.

113.    The parents expressed these thoughts and goals to Mr. Tingley, and sought his professional expertise as a counselor to work with their daughter towards that goal. The daughter also expressed a willingness to meet and talk with Plaintiff. Accordingly, Plaintiff entered into this counseling relationship, taking the girl on as a client.

Plaintiff's Verified Complaint
Case No. _____                              23

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

114.   Plaintiff's counseling of this client mainly consisted of private discussions, consisting for the most part of prompting questions, and sympathetic listening. It also included discussions with the girl and her parents together.

115.   At no point did the client indicate that she was talking with Plaintiff against her will, or that she felt that Plaintiff was coercing her in any manner.

116.   After several counseling sessions, the girl expressed a desire to become more comfortable with her biological sex, notwithstanding her previous claims of a male gender identity. Plaintiff did not challenge her new goal or the "change" that it would mark, but worked with her toward that goal. Over the course of several years of observing and talking with this girl, Plaintiff saw a notable improvement in her demeanor and self-esteem, and understood the client to be more comfortable identifying herself as a girl and to be much happier with her direction in life.

117.   Another recent instance occurred when a Christian family came to Mr. Tingley after their minor daughter had begun expressing discomfort with her biological sex and asserting a male gender identity. This girl had exhibited no signs associated with gender dysphoria as a young child, but had begun to assert a transgender identity only after exposure to online material advocating transgender identification.

118.   Her parents were aware that gender dysphoria is often accompanied by mental health co-morbidities, that gender identity in young people is not necessarily fixed, and that long-term adoption of a transgender identity by their daughter would likely lead to sterilization and lifelong medical complications.

119.   These parents also sought a counselor who would assist their daughter in understanding herself and exploring the reasons for her unhappiness with her sex and identity as a girl, and hopefully enable her to return to comfort with her female body and reproductive potential, and with a gender identity as a female, girl, and in years to come, woman.

120.   However, while the parents of this minor client expressed their faith-based hopes and goals for their daughter's counseling regarding gender identity, they also discussed the Counseling Censorship Law with Plaintiff, and expressed great fear about what being accused of being involved in a violation of that Law might do to their family, including their fear that it could lead to the intrusion of Child Protective Services between themselves and their daughter.

121.   As the daughter was willing to meet and talk with Plaintiff, Plaintiff took her on as a client. However after a few sessions, without expressing any dissatisfaction with Plaintiff's counseling, the parents terminated the counseling relationship, on information and belief due to their fears resulting from the Counseling Censorship Law.

122.   Plaintiff has supported several adolescent clients in similar circumstances who have sought his help as a therapist in addressing questions and concerns surrounding their gender identity. In some of those cases, during counseling the client has specifically expressed the desire to accept and achieve comfort with their God-given sex as a faith-driven motivation for their goals in counseling. In others of such cases, neither the parents nor the client have expressed any religious motivation for achieving their chosen goals.

123.   Given the rapid and large increase in children and teens who are experiencing gender dysphoria, and given Plaintiff's visible identity as a licensed counselor who is a Christian who has previously and is currently helping clients with these issues, Plaintiff expects with high confidence that parents and minors will continue to come to him for counseling with a goal of helping a child who is exhibiting gender dysphoria or a transgender identity return to comfort with a gender identity aligned with his or her biological sex. Plaintiff wishes to provide such counseling for minors who are willing to engage in such conversational counseling on a strictly voluntary basis.

D.   Counseling and change relating to sexual attractions

124.   Individuals who experience same-sex attractions may and do have multiple reasons not to accept those attractions nor to let those attractions define their lives and relationships.

125.   A young person may have a personal life goal to enter into a stable marriage in which he or she can raise children who are the natural, genetic children of both spouses. Indeed, the ability to form one's own natural family has been recognized as one of the greatest joys in life, and one of the most fundamental human rights, across cultures and history. Of course, this can only happen in a heterosexual relationship.

126.   Further, major historic faiths including Judaism, Christianity, and Islam, have long taught that the only moral context for sexual relationships is within a heterosexual marriage. Individuals who believe any one of these religions may well wish to bring both their desires and their conduct into conformity with the moral teachings of their faith, and what they believe to be the commandments of God. Indeed, recognizing that humans experience wrong or misguided desires in many contexts—not just sexual—and striving to bring not just conduct but desires into line with the moral teachings of the faith, is a central aspect of each of these religions.

127.   For example, the Lubavitcher Rebbe Menachem Mendel Schneerson, an internationally famous Jewish teacher, in a well-known letter to a young man who struggled with same-sex attractions, wrote that "Every day children are born with particular natures and innate tendencies or drives, some of them good and some of them bad. . . . The Creator endowed human beings with the capacity to improve, indeed even to change their 'natural' (i.e. innate) traits." Similarly, Christianity teaches that our "natural" desires are often misguided and harmful, but that God can work within an individual to give him a "new heart."(Ezekiel

Plaintiff's Verified Complaint
Case No. _____

26

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

26:36.) The Bible's teaching in the New Testament further emphasizes both the necessity and the possibility of profound inner change, for example in the Apostle Paul's instruction to believers: "Do not conform to the pattern of this world, but be transformed by the renewing of your mind. Then you will be able to test and approve what God's will is—his good, pleasing and perfect will." (Romans 12:2.) With regard to gender identity, formal teaching of the Catholic Church instructs believers that "man . . . has a nature that he must respect and that he cannot manipulate at will" (*Laudato Si*, No. 1555 (2015)), and that "the young need to be helped to accept their own body as it was created" (*Amoris Laetitia*, No. 285 (2016)).

128.    Each of these religions also teaches that, with divine help, individuals *can* make real progress in changing our desires and bringing them into line with the moral teachings of the faith—that is, that we are not mere machines irrevocably destined to be inescapably controlled by chemically programmed desires.

129.    Each of these religions also teaches that faith in God and obedience to his moral law is more important to an individual's being and personal identity than are his or her sexual desires. Even noted authors Professors Lisa Diamond and Clifford Rosky, who consider themselves advocates for LGBTQ issues, recognize that assertions that sexual orientation cannot change "fail to adequately serve the interests of sexual minorities [i.e., all who experience anything other than purely heterosexual attractions] from ethnic, cultural, or religious backgrounds that do not share the contemporary Western conceptualization of sexual orientation as a defining status definition. Such individuals may believe that their status as a . . . religious minority is more critical to their sense of selfhood than their status as a sexual minority." Diamond & Rosky (2016) 21.

130.    In fact, the historic Western religions do not "share the contemporary Western conceptualization" that sexual orientation defines the individual, and instead contend that belief in and obedience to God is "more critical to [the

Plaintiff's Verified Complaint
Case No. _____                                27

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

believer's] sense of selfhood" than is his or her sexual desires. Those who adhere to these faiths are fully entitled to believe this, to structure their own lives accordingly, and to pursue their own goals of personal identity and conduct informed by those beliefs.

131.    It is often asserted that sexual attractions or orientation are fixed and not subject to change. But this is incorrect, and indeed is unsustainable in the face of modern science. In fact, a much-cited recent review of the relevant scientific literature by prominent LGBTQ-advocate authors concluded that "[A]rguments based on the immutability of sexual orientation are unscientific, given that scientific research does not indicate that sexual orientation is uniformly biologically determined at birth or that patterns of same-sex and other-sex attractions remain fixed over the life course." Diamond & Rosky (2016) 2. These authors conclude that rather than resting on science, assertions that sexual orientation cannot change "rely on unspoken legal and moral premises whose validity must be questioned." Diamond & Rosky (2016) 11.

132.    In the past many authors have hypothesized that same-sex attractions are biologically determined. However, no such causes have been found. A 2019 large-scale study by a team of authors from Harvard, MIT, and several other prestigious institutions analyzed the genomes of *almost half a million individuals*, along with self-reported information about heterosexual and same-sex sexual behaviors from these individuals. This massive study found only "very small" correlations between any genes and same-sex behavior. The authors concluded that the impact of genetic factors on sexual orientation were so small that they "do not allow meaningful prediction of an individual's sexual preference." Andrea Ganna et al., *Large-scale GWAS reveals insights into the genetic architecture of same-sex sexual behavior*, SCIENCE, 882 (2019).

133.     Before the extensive genomic work of Ganna et al. published in 2019, some studies had attributed a somewhat higher influence of genetics on the formation of sexual orientation. But even these studies attributed only minority influence to genetics, leaving sexual orientation no more genetically determined than "a range of characteristics that are not widely considered immutable, such as being divorced, smoking, having lower back pain, and feeling body dissatisfaction." Diamond & Rosky (2016) 4.

134.     Rather than being biologically predestined, many individuals who identify as other than heterosexual believe that they possessed and exercised choice in their sexual orientation. Surveying the literature again, Diamond and Rosky reject the claims of "[b]oth scientists and laypeople . . . that same-sex sexuality is rarely or never chosen," instead concluding that "individuals who perceive that they have some choice in their same-sex sexuality are more numerous than most people think." Diamond & Rosky (2016) 20.

135.     Suggesting there is much left to learn about the complex origins of same-sex attractions and behavior, the American Psychological Association's stance on the biological origin of sexual orientation has shifted over the years. In 1998, the APA appeared to support the theory that homosexuality is innate and people were simply "born that way," asserting that "There is considerable recent evidence to suggest that biology, including genetic or inborn hormonal factors, plays a significant role in a person's sexuality." But just ten years later, in 2008, the APA described the matter differently:

> "There is no consensus among scientists about the exact reasons that an individual develops a heterosexual, bisexual, gay, or lesbian orientation. Although much research has examined the possible genetic, hormonal, developmental, social, and cultural influences on sexual orientation, *no findings have emerged that permit scientists to conclude that sexual orientation is determined by any particular factor or*

Plaintiff's Verified Complaint
Case No. _____                29

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

*factors.* Many think that nature and nurture both play complex roles...." (Emphasis added).[13]

136.    As to the possibility of *change* in sexual attractions or behaviors; it has often been assumed or asserted in the literature in the past, and is still often asserted by non-scientists or in the popular press today, that sexual orientation is fixed and unchanging. However, this assumption is not just unfounded, but provably false. Diamond and Rosky concluded in 2016, after surveying the scientific literature, that "Studies unequivocally demonstrate that same-sex and other-sex attractions do change over time in some individuals," and that the evidence for this is now so clear as to be "indisputable." Diamond & Rosky (2016) 6-7.

137.    Empirically, the frequency of change in sexual orientation is particularly high among those who experience same-sex attraction.

138.    Thus, after reviewing and summarizing extensive scientific literature, chapters in the American Psychological Association Handbook of Sexuality and Psychology conclude that "research on sexual minorities [i.e., all those who do not identify as exclusively heterosexual] has long documented that many recall having undergone notable shifts in their patterns of sexual attractions, behaviors, or identities over time" (636), and that "Youth who are unsure or uncertain of their identity predominantly transition to a heterosexual identity" (562).

139.    Many individual articles and studies reach the same conclusion.

140.    A study by authors from the Harvard School of Public Health and other respected institutions examined "gender- and age-related changes in sexual orientation identity from early adolescence through emerging adulthood" in over 13,000 youth from 12 to 25 years of age, examining data collected for each

---

[13] American Psychological Association, *Answers to Your Questions For a Better Understanding of Sexual Orientation and Homosexuality* (2008), https://www.apa.org/topics/lgbtq/orientation (last visited April 29, 2021).

Plaintiff's Verified Complaint
Case No. _____

30

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

participant at four times over a period of seven years. Miles Ott et al., *Stability and Change in Self-Reported Sexual Orientation Identity in Young People: Application of Mobility Metrics*, 40 ARCH. SEXUAL BEHAV., 519 (2011). On this sample, Diamond and Rosky note that "Of the 7.5% of men and 8.7% of women who chose a nonheterosexual descriptor at ages 18 to 21, 43% of the men and 46% of the women chose a different category by age 23. Among the same-sex-attracted youth who changed, 57% of the men's changes and 62% of the women's changes involved switching to completely heterosexual."

141.   Diamond and Rosky gather the results of the Ott et al. study along with two separate "longitudinal" studies (i.e., studying the same individuals over time), done by different researchers at different times on different samples, and report that, for young adult populations (starting ages from 18 to 26), of those who initially reported "any same sex attractions," every study found that between 40% to 60% of each sex reported a "change in attractions" when resurveyed a few years later. Of those who experienced a "change," at least half and as high as 83% "changed to heterosexuality at the second assessment." Diamond & Rosky (2016) 7.

142.   Authors analyzing data collected for approximately 2,500 individuals as part of the National Survey of Midlife Development in the United States found that, of those of any age who identified at the start of the study as bisexual, a decade later approximately 32% identified as exclusively heterosexual, while of those who identified at the start of the study as homosexual (that is, exclusively attracted to the same sex), a decade later 28% identified as attracted to the opposite sex (heterosexual or bisexual). Steven E. Mock & Richard P. Eibach, *Stability and Change in Sexual Orientation Identity Over a 10-year Period in Adulthood*, 41 ARCHIVES OF SEXUAL BEHAVIOR 642 (2011) (Table 2). Heterosexual identity was far more stable: among those who identified as heterosexual at the start of the study,

only 0.78% of men and 1.36% of women identified a different orientation a decade later. Mock & Eibach (2012) 645.

143.  Another often-cited paper by prominent researchers summarized scholarship and cautioned that "there was little evidence of true bipolarity in sexual orientation" and that sexual orientation is instead "a continuous construct." These authors observed that one study found that "Only 38% of exclusive same-sex attracted females stayed in this group [between ages 21 and 26], with the rest moving into 'occasional' same-sex attraction (38%) or exclusive opposite-sex attraction (25%)," while another found that across a multi-year study period "Most (62%) young women changed their identity labels at least once. . .  Over time, lesbian and bisexual identities lost the most adherents and heterosexual and unlabeled identities gained the most." In short, this paper's literature review found that "Evidence to support sexual orientation stability among nonheterosexuals is surprisingly meager." Ritch C. Savin-Williams & Geoffrey L. Ream, *Prevalence and Stability of Sexual Orientation Components During Adolescence and Young Adulthood*, 36 ARCHIVES OF SEXUAL BEHAVIOR 385, 386 (2007).

144.  Savin-Williams' and Ream's own study of adolescents and young adults pointed to the same conclusion, "highlight[ing] the high proportion of participants with same- and both-sex attraction and behavior that migrated into opposite-sex categories between [interview periods]." Savin-Williams & Ream (2007) 388.

145.  Meanwhile, other noted scholars argue that the "sexual orientation" categories of "gay" or "straight" are to some extent socially defined, such that surrounding "cultural press" may in essence coerce an adolescent boy who merely experiences "affectional bonding" with another male to categorize and thus understand himself through the rigid binary category of "gay," whereas that same type of affection would not lead the boy to think of himself that way in a different

cultural setting. Phillip Hammack, *The Life Course Development of Human Sexual Orientation: An Integrative Paradigm*, 48 HUMAN DEVELOPMENT, 267 (2005).

146.   In light of these facts and considerations, some individuals who believe that they are experiencing same-sex attractions may want to understand themselves better, to understand relationships and life experiences that may have produced those feelings in themselves, and to examine whether any of those influences, understandings, and feelings can be changed, so that they can happily pursue the life built around a heterosexual relationship that they desire, and that they believe their faith instructs them to pursue. Because self-understanding is difficult, they may wish the assistance of a sympathetic professional counselor to assist them in that inquiry and effort.

147.   It is also beyond dispute that there are large numbers of individuals who at one time in their lives have considered themselves gay or lesbian, and who have experienced same-sex attraction and even relationships, but who later, and with the support of secular or religious counseling, developed opposite-sex attractions, and even entered into lasting opposite-sex marriages. For some, this change has been motivated by and assisted by religious conviction; for others, not. Others, while not necessarily succeeding in eliminating same-sex attractions, have changed their behaviors to obey the moral teachings of their faith by abandoning same-sex relationships in favor of a celibate life. Multiple organizations exist made up of individuals who have experienced one of these paths as their own story, and who affirm that their lives are happier and more fulfilled as a result.

148.   It is often asserted that "conversion therapy" or other forms of "sexual orientation change efforts" (or "SOCE") are severely harmful. In fact, there is no meaningful evidence that conversational counseling with willing clients to explore possibilities of change in unwanted same-sex attractions is harmful to most or even

Plaintiff's Verified Complaint
Case No. _____

33

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

many participants. On the contrary, in a major 2009 report based on a review of many studies, a task force of the American Psychological Association concluded:

> a) "Although the recent studies do not provide valid causal evidence of the efficacy of SOCE or of its harm, some recent studies document that there are people who perceive that they have been harmed through SOCE… just as other recent studies document that there are people who perceive that they have benefited from it. . . . . We conclude that there is a dearth of scientifically sound research on the safety of SOCE. Early and recent research studies provide no clear indication of the prevalence of harmful outcomes among people who have undergone efforts to change their sexual orientation or the frequency of occurrence of harm because no study to date of adequate scientific rigor has been explicitly designed to do so. Thus, we cannot conclude how likely it is that harm will occur from SOCE." (42) b) "[I]t is still unclear which techniques or methods may or may not be harmful." (91)

149.   Writing in 2021, a group of proponents of "SOCE" bans affirmed that the pertinent research base remains sparse up to the present, providing an insufficient basis on which to make confident judgments about SOCE. As they wrote, "There is limited SOGIECE [sexual orientation and gender identity and expression change efforts]-related research—a critical knowledge gap . . . Rigorous research syntheses to support or refine legislative proposals related to SOCIECE are not available at this time." David Kinitz et al., *The Scope and Nature of Sexual Orientation and Gender Identity and Expression Change Efforts: A Systematic Review Protocol,* 10 SYSTEMATIC REVIEWS, 3 (2021).

150.   Specifically with respect to willing participants who are motivated at least in part by religious beliefs and goals, a six year longitudinal study concluded that "The attempt to change sexual orientation did not appear to be harmful on average for these participants. The only statistically significant trends that emerged…indicated improving psychological symptoms." Stanton Jones & Mark

1    Yarhouse, *A longitudinal study of attempted religiously mediated sexual orientation*
2    *change*, 37 J. OF SEX & MARITAL THERAPY, 404, 424 (2011).

3    151.    It is also frequently asserted—despite the extensive evidence that
4    change in the components of sexual orientation is not only possible but frequent—
5    that counseling to assist an individual toward desired change is never effective.
6    Again, the available science does not support this assertion.

7    152.    The same 2009 APA Task Force report acknowledged that "There are
8    no studies of adequate scientific rigor to conclude whether or not recent SOCE do or
9    do not work to change a person's sexual orientation." (120) More specifically:

    "We found that nonaversive and recent approaches to SOCE
    have not been rigorously evaluated. Given the limited amount
    of methodologically sound research, we cannot draw a
    conclusion regarding whether recent forms of SOCE are or are
    not effective." (43)

13    153.    Plaintiff uses only a "nonaversive," conversational method of
14    counseling.

15    154.    In fact, authors from a variety of perspectives acknowledge that there
16    is evidence that voluntary counseling is effective for at least some individuals who
17    are highly motivated to change sexual attractions and behaviors.

18    155.    The 2009 APA Task Force report stated:

    a) "Former participants in SOCE reported diverse evaluations
    of their experiences: Some individuals perceived that they had
    benefited from SOCE, . . . [These] individuals reported that
    SOCE was helpful—for example, it helped them live in a
    manner consistent with their faith. Some individuals described
    finding a sense of community through religious SOCE and
    valued having others with whom they could identify." (3) b)
    "For instance, participants reporting beneficial effects in some
    studies perceived changes to their sexuality, such as in their
    sexual orientation, gender identity, sexual behavior, [and]
    sexual orientation identity…." (49)

156.   The longitudinal study of religiously motivated nonaversive therapy conducted by Jones and Yarhouse found that about half of participants reported progress towards their desired goal, with 23% of study participants reporting substantial reduction in homosexual attraction and substantial increase in heterosexual attraction and functioning, while an additional 30% of participants reported that same-sex attraction remained present only incidentally or in a way that did not seem to bring about distress.

157.   A 2010 study surveyed 117 men who participated in some form of secular or religious counseling or support group activities designed to reduce same-sex attraction. Of these, some were single and some were in heterosexual marriages. 88% were motivated at least in part by what they perceived as conflict between their same-sex desires and conduct and the teachings of their faith. Within the whole study group, responses indicated a "large effect" in decrease of same-sex attractions and behavior, and also a "large effect" in increase of heterosexual attraction and behavior. Elan Karten & Jay Wade, *Sexual orientation change efforts in men: a client perspective*, JOURNAL OF MEN'S STUDIES, Vol. 18 No. 1, 84 (2010).

158.   Over the years, Plaintiff Tingley has had multiple clients, including minor clients, who experienced unwanted same-sex attraction and desired Mr. Tingley's help in reducing those attractions so that they could enter into heterosexual romantic relationships and live the family lives which they longed for, and also so that they could live in a manner consistent with the moral teachings of their Christian faith.

159.   For example, in recent years Plaintiff counseled an older teen whose parents first brought him to Plaintiff. Over time, this client has himself sought Plaintiff's counsel on a number of topics including attraction to pornography and unwanted same-sex attractions.

Plaintiff's Verified Complaint
Case No. _____

36

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

160. Like many young people, this individual first fell into a pattern of repeated access to online pornography. In time, he encountered online pornography depicting same-sex conduct, and believes that this pornography stirred up same-sex attractions in himself that he did not previously experience and would not otherwise have experienced.

161. The client has a personal Christian faith, and desires to live his life in accordance with what he understands to be the teachings of his faith. He is of the opinion that he will flourish—spiritually, emotionally and in relationships—through obedience to the teachings of his faith. He believes that his faith in God is a personal priority over sexual attractions, and that God has determined his identity according to what is revealed in the Bible rather than his own desires and perceptions.

162. In that context, the client has sought Plaintiff's counsel to achieve a personal goal of reducing his same-sex attractions and strengthening his sexual attraction to women.

163. Plaintiff never promises clients that he will be able to solve the problems they bring to him, and he has not done so for this individual. However, he provides sympathetic counseling that is respectful of the client's faith and his personal goals and desires. Through ordinary techniques of counseling including caring listening and questions to help the client understand himself and his personal history, Plaintiff supports this client as he works toward the change he desires to see in his own life. And indeed this particular client feels that he has made, and is making progress towards his goals.

164. This particular client's experience is not unique. Over the years Mr. Tingley has worked with several minors—both male and female—who have revealed similar thoughts and circumstances, and have sought his help in reducing

Plaintiff's Verified Complaint
Case No. _____

37

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

same-sex attractions and developing their sense of sexual attraction to the opposite sex.

165.   Some former clients who sought Plaintiff's counseling aid on this topic as minors achieved their goals, and as adults are now living stable and happy lives in heterosexual marriages.

166.   Mr. Tingley currently works with and will continue to work with clients to these ends, and based on his many years of experience, he expects that he will continue to engage with minor clients with similar goals in future practice.

E.   Plaintiff's counseling relating to sexual "behaviors"

167.   From time to time, Plaintiff also works with minor teens who have expressed a desire to desist from ongoing sexual behaviors which they consider harmful to themselves and inconsistent with their religious beliefs about sexual morality.

168.   Several minor clients have sought Plaintiff's help to break out of a pattern of frequent viewing of pornography for sexual gratification. For example, Plaintiff recently worked with a minor who came for counseling after his mother had initially sought help for him. The client had become obsessed with watching pornography, and despite the efforts of the mother to restrict access to computers and the internet, the client would still find ways to get online and view pornography.

169.   The client came from a Christian home and attended church. During discussions with the Plaintiff, the client said that he did not like the fact that he was so drawn to pornography, and personally expressed the belief that it was wrong to look at pornography. He further expressed feeling out of control in his viewing of pornography, and affirmed that he wanted to stop. Plaintiff worked with the client towards a goal of ending his regular viewing of pornography, with the client making good progress toward that end during the time that they spent together.

170.    Plaintiff has supported many other clients in similar circumstances who have sought to stop viewing pornography after expressing a wish to change this behavior that they perceive to be wrong and unhealthy for them to engage in.

171.    Plaintiff has also worked with clients who have wanted to cease consensual sexual activity with others of the opposite sex. One example occurred with a teenage client who had initially come to the Plaintiff to address academic difficulties at school. The client was a Christian, involved with his church youth group and with church mission trips to serve other communities. After several counseling sessions with the Plaintiff, the client raised concerns about the way in which he viewed girls, and in particular his relationship with his girlfriend.

172.    The client believed that it was not right for him to be sexually involved with his girlfriend, and felt that his thoughts and behaviors were in conflict with his faith and morals. He expressed frustration that he repeatedly fell into conduct that he believed was wrong and harmful to both himself and his girlfriend, and expressed a desire to align his sexual thoughts and actions with his faith. The client worked with the Plaintiff to that end, as part of a wider effort on the part of the client to become a more healthy and stable individual. Over time, the Plaintiff observed the client moving to a much happier place, with better self-esteem and drive, as the client addressed these behaviors that he believed to be wrong and harmful.

173.    Similar scenarios frequently arise in Mr. Tingley's practice, and he works with his clients toward goals that enable them to live happier, stabler and more fulfilled lives. Based on his experience and his understanding of adolescents and teens, Plaintiff expects that minor clients will continue to seek his counseling assistance to change sexual behaviors that they believe are harmful and inconsistent with their personal goals and religious convictions.

Plaintiff's Verified Complaint
Case No. _____

39

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

174.   No client has ever filed any complaint against Plaintiff relating to any counseling that Plaintiff has provided, related to any issue of gender identity, sexual attraction, sexual behaviors, or otherwise.

F.   The impact of the Counseling Censorship Law on the Plaintiff's practice and clients

175.   For professional, religious, and human reasons, Mr. Tingley desires to continue to support current and future clients who seek his help with issues relating to gender identity, sexual attractions, and sexual behaviors.

176.   The Counseling Censorship Law seeks to prevent Plaintiff from providing counsel in these areas that his clients desire, that is consistent with their own religious beliefs and with Plaintiff's, and that is consistent with Plaintiff's professional judgment as to what path will lead his clients into healthy, fulfilled, and stable lives over the long term.

177.   If Plaintiff provides such counsel, the Counseling Censorship Law threatens him with harassment, investigation, and severe penalties potentially including the loss of his license and his livelihood. He fears the credible and substantial risk of being subjected to enforcement proceedings under the Counseling Censorship Law for each client that raises these issues with him.

178.   While at present Plaintiff continues to provide such counsel to clients who request it, Plaintiff must and does experience a substantial and reasonable fear that hostile activists will maliciously and dishonestly present themselves as clients in an effort to entrap him and accuse him of violating the Counseling Censorship Law. Similarly, even in the case of a client who seeks Plaintiff's assistance in good faith, Plaintiff must and does reasonably fear that some other individual—even an unrelated individual—will learn of the nature of such counseling and file a complaint against Plaintiff, or even initiate a third-party enforcement action as authorized by the Counseling Censorship Law.

179.   In practice, this has meant that conversations with clients on matters of gender, gender expression, sexual orientation, sexual behaviors, or sexual or romantic attractions—particularly at the outset of conversations with a new client, or when these issues are first raised by an existing client—are inevitably more guarded and cautious than would otherwise be the case.

180.   Plaintiff is not able to freely and without fear speak what he believes to be true, and his client is therefore denied the right to receive open and uninhibited thoughts from his or her chosen counselor. This chilling is inimical to a healthy counseling relationship, which must be built on openness and trust between client and counselor.

181.   In fact, the vagueness surrounding the terms and definitions involved in the Counseling Censorship Law mean that Plaintiff must fear that almost *any* exploratory discussions he has with his clients on matters of gender, gender expression, sexual orientation, sexual behaviors, or sexual or romantic attractions could later be accused as violations of the Counseling Censorship Law, casting a chill over all such conversations. Since these are very common matters of concern for troubled teens, this chill has a grave impact on both Plaintiff and his clients.

182.   The prospect of merely going through an investigative process if accused of a violation of the Counseling Censorship Law—regardless of whether a violation is ultimately shown—causes Plaintiff to fear these exploratory discussions, particularly with the likelihood that such a process would be accompanied by hostile and uninformed publicity.

183.   Not only does the Counseling Censorship Law chill discussions that Plaintiff has with his clients, but he also is chilled from more actively publicizing the fact that he offers to counsel minors on these issues, as he would otherwise desire to do. Specifically, Plaintiff would advertise on his practice website that he offers counsel on sexual orientation and gender identity issues to adolescents, but is

Plaintiff's Verified Complaint
Case No. _____

41

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

currently chilled from doing so because of the explicit prohibitions of the Counseling Censorship Law and the prospect of enforcement proceedings being brought against him.

184.    On information and belief, this chilling effect is intentional on the part of the State of Washington because of its clear disapproval of the content of Plaintiff's speech, and the religious beliefs underlying that speech.

185.    In fact, for Plaintiff to be in compliance with the Counseling Censorship Law, not only must he actively censor his own speech, but the Law compels him to counsel and speak to his clients on the premise that seeking to reduce same-sex attraction, and achieving comfort with their biological sex *could not* be successful, and would instead harm their physical and psychological well-being. Not only are these viewpoints directly contrary to the beliefs of Mr. Tingley and those of many of his clients, but they are also contradicted by science and by the experience of many of his clients.

186.    If Plaintiff—and other license holders in the State of Washington—are successfully barred from working with their clients on matters of gender, gender expression, sexual orientation, sexual behaviors, or sexual or romantic attractions by the Counseling Censorship Law, then those clients are effectively denied access to ideas that they wish to hear, and to counseling that is consistent with their own personal faith, life goals, and motivations. Parents of affected minor clients are likewise deprived of their right to hear such ideas, and to direct the upbringing of their children.

187.    Likewise, when Plaintiff—and other license holders in the State of Washington—are caused by fear of the Counseling Censorship Law and loss of their livelihoods to self-censor even in part the messages, ideas, encouragement, and support that they would otherwise offer their clients, then those clients are effectively denied full and unfettered access to ideas that they wish to hear, and to

Plaintiff's Verified Complaint
Case No. _____

42

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

counseling that is consistent with their own personal faith, life goals, and motivations. Parents of affected minor clients are likewise deprived of their right to hear such ideas, and to direct the upbringing of their children.

## COUNT I

### For Denial of Free Speech Rights of Mr. Tingley
### That Are Guaranteed by the First Amendment

188. Plaintiff incorporates all paragraphs above by reference.

189. By purporting to censor what Plaintiff may or may not say in the course of his professional counseling work, the Counseling Censorship Law violates Plaintiff's First Amendment rights.

190. The Counseling Censorship Law intrudes the censoring hand of government into one of the most private and sensitive spaces—the counseling room where an individual talks with his chosen counselor about his most personal longings, troubles, concerns, and personal goals.

191. Plaintiff's right of free speech protected by the First Amendment includes the right to speak freely with his clients about the problems, questions, and goals that they bring to him. It includes the right to speak the ideas, suggestions, and advice that Plaintiff believes to be true and helpful. And this right to speak freely and honestly is fully protected even if the majority of the Washington State legislature disapprove of the client's chosen goals, and disagree with Plaintiff's views and advice. Indeed, the central role of the First Amendment is to protect the right of individuals to speak beliefs and views that the government disapproves of.

192. The Counseling Censorship Law is not a neutral "time, place or manner" regulation. Instead, it censors the conversations that a counselor and

Plaintiff's Verified Complaint
Case No. _____

43

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1  client may engage in based on the content of that speech, and based on its
2  viewpoint.

3  193.  This is evident from the fact that determining whether a counselor's or
4  therapist's speech violates the Counseling Censorship Law will necessarily require
5  an inquiry into both the content and the viewpoint of that speech.  The Law
6  purports to outlaw and punish only certain speech relating to specifically listed
7  categories of content, including "sexual orientation or gender identity," change to
8  "behaviors or gender expressions," and efforts to "eliminate or reduce romantic
9  attractions or feelings towards individuals of the same sex."

10  194.  As to these topics, the Counseling Censorship Law prohibits only
11  speech promoting a certain viewpoint concerning human sexuality, identity,
12  morality, and indeed free will: that is, the viewpoint that change in an individual's
13  gender identity or sexual orientation to align with their natural reproductive
14  biology is possible, and may be a legitimate and desirable goal for some individuals.

15  195.  The Law is not viewpoint neutral because it prohibits "efforts to . . .
16  eliminate or reduce sexual or romantic attractions or feelings toward individuals of
17  the same sex," but does not prohibit efforts to reduce sexual or romantic attractions
18  toward a member of the opposite sex, nor does it prohibit efforts to increase
19  attractions toward a member of the same sex.

20  196.  The Law is not viewpoint neutral because it permits counseling that
21  reflects "acceptance" and "facilitation" of any sort of "exploration and development"
22  of gender identity or sexual attractions or behaviors—except "change" to "sexual
23  orientation or gender identity." Meanwhile, it prohibits counseling that does not
24  insist on "accepting" a client's undesired feelings and instead seeks to assist that
25  client toward his chosen goal of changing feelings relating to gender identity or
26  sexual attractions.

27

Plaintiff's Verified Complaint
Case No. _____                              44

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

197.   Therefore, far from being viewpoint and content neutral, the Counseling Censorship Law actively aims to suppress the dissemination of ideas and information about human sexuality and the human capacity for change in this area that are unpopular with and disapproved by the government of the State of Washington.

198.   The Counseling Censorship Law also seeks to compel speech, by demanding that counselors and therapists speak to clients on the premise that seeking to align an individual's sense of gender identity with his or her biological sex, or seeking to align their sexual attractions and relationships with their body's natural reproductive capabilities, is not possible or desirable, and will necessarily harm them, regardless of their own life goals and religious beliefs. This necessarily alters the content of speech for therapists who disagree with the viewpoint of the government on these matters.

199.   The Counseling Censorship Law does not adopt the least restrictive means to pursue a compelling government interest.

200.   The government has no cognizable interest at all—let alone a compelling interest—in preventing citizens from hearing ideas that those citizens wish to hear from their chosen counselor or therapist.

201.   The government has no cognizable interest at all—let alone a compelling interest—in preventing the dissemination of ideas that the government believes are false, offensive, misguided, or even hurtful.

202.   The Counseling Censorship Law is overbroad rather than narrowly tailored. Assuming that there are particular physical or pharmaceutical practices that the state may legitimately regulate to safeguard the physical and psychological well-being of a minor, the Counseling Censorship Law makes no attempt at all to identify those practices and target its prohibitions against them. As the large preponderance of mental health counselors engage solely in speech, a substantial

Plaintiff's Verified Complaint
Case No. _____

45

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1  number of the Counseling Censorship Law's applications are unconstitutional

2  judged in relation to what any possible legitimate application might be.

3      203.   For these reasons, the Counseling Censorship Law is unconstitutional

4  as a violation of the free speech rights of Plaintiff Brian Tingley as well as all other

5  "license holders."

6      204.   This ongoing deprivation of constitutional rights constitutes

7  irreparable injury.

8      205.   Wherefore, Plaintiff Brian Tingley respectfully requests that the Court

9  grant declaratory and injunctive relief against the Counseling Censorship Law

10  pursuant to 28 U.S.C. §§ 20201 and 2202, as set forth in the Prayer for Relief.

11                          **COUNT II**

12

13  <u>For Denial of Free Speech Rights of the Clients of Mr. Tingley</u>
    <u>That Are Guaranteed by the First Amendment</u>

14      206.   The First Amendment not only protects the right of each individual to

15  speak, but also to *hear* desired information and ideas, free from government

16  censorship. This includes ideas that depart from conventional wisdom, and ideas

17  that the government believes are false, offensive, misguided, or even hurtful.

18      207.   By prohibiting counselors and other "license holders" from talking to

19  minor clients with a view toward helping them achieve their personal goals of

20  changing their feelings of gender identity to align with their biological sex, or

21  reducing same-sex attraction or increasing opposite-sex attraction, the Counseling

22  Censorship Law violates those clients' First Amendment right to hear speech that

23  they and their parents desire them to hear.

24      208.   For the reasons set forth above (¶ 192-197), this infringement of the

25  First Amendment rights of counseling clients including Plaintiff's minor clients is

26  neither content neutral nor viewpoint neutral.

27

Plaintiff's Verified Complaint
Case No. _____                46                ALLIANCE DEFENDING FREEDOM
                                                          15100 N. 90th Street
                                                          Scottsdale, Arizona 85260
                                                          (480) 444-0020

209.   For the reasons set forth above (¶ 199-202), this infringement of the First Amendment rights of counseling clients including Plaintiff's minor clients is not narrowly tailored to serve a compelling governmental interest.

210.   Counselors including Plaintiff have standing to assert and seek redress for the First Amendment rights of their clients that are violated by enforcement of the Counseling Censorship Law, and also by the chilling effect that the very existence of that Law has on free and open communications between these clients and their chosen counselors.

211.   Counselors, including Plaintiff, enter into an extremely close and intimate relationship with clients who seek their assistance to pursue personal goals relating to the sensitive and important topics of sexual attractions, behaviors, and orientation—a relationship in which openness and candor is crucial.

212.   Many clients feel that their discussions with their chosen counselor about sexual attractions, behaviors, and orientation involve the most intimate, difficult, important, and embarrassing topics in their lives. Because of this, it is extremely difficult or even impossible as an emotional and social matter for these clients to step forward to protect their own constitutional rights to engage in the conversations with their counselor that they desire.

213.   Further, because the Counseling Censorship Law on its face does not penalize *receiving* counsel of any sort, clients are not themselves subject to any threat of enforcement under the Law, so they risk being denied their right to receive desired counseling while at the same time being denied any forum in which to assert and protect that right.

214.   The violation of the protected free speech rights of counseling clients, including minor clients of Plaintiff, constitutes irreparable injury.

Plaintiff's Verified Complaint
Case No. _____
47
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

215. Wherefore, Plaintiff respectfully requests that the Court grant declaratory and injunctive relief against the Counseling Censorship Law pursuant to 28 U.S.C. §§ 20201 and 2202, as set forth in the Prayer for Relief.

### COUNT III

<u>For Denial of the Due Process Rights of Plaintiff in Violation of the Fourteenth Amendment Because the Prohibitions of the Counseling Censorship Law Are Impermissibly Vague</u>

216. The Fourteenth Amendment's guarantee of Due Process prohibits the government from imposing or threatening punishment based on laws that are so vague that they do not provide fixed legal standards as to what is prohibited and what is not, and so leave room for standardless or discriminatory enforcement.

217. In fact, as detailed below, essentially all of the key terms in the Counseling Censorship Law are undefined in the Law itself, and also undefined in science, and indeed have more in common with slogans than with a fixed standard identifying what counseling speech is prohibited and subject to punishment under the Law, and what is not.

218. As a result, the Counseling Censorship Law is unconstitutional on its face because it does not provide adequate standards or guidelines to govern the actions of those empowered to enforce it—which, as noted above, includes not only the Secretary of Health, the Attorney General, and the Health Systems Quality Assurance team, but also "any other person." Instead, the Law enables and authorizes those who are empowered to pursue enforcement actions in this highly controversial and politicized area to do so based on their personal predilections, rather than on any fixed legal standard, and likewise to pursue discriminatory enforcement.

219. The vagueness and lack of fixed legal standards in the Counseling Censorship Law is all the more impermissible because it impacts a fundamental

right, in that because of this vagueness and the unbounded discretion that it affords
to those authorized to bring enforcement actions, counselors engaging with a client
who raises concerns relating to gender identity, same-sex attractions, or sexual
behaviors must be all the more fearful that they will be accused of violating the law.
As a result, consciously or unconsciously, counselors including Plaintiff inevitably
engage in a degree of self-censorship that infringes the freedom of discussion of both
counselor and client.

220.    The Counseling Censorship Law is unconstitutionally vague because it
provides no standards or guidelines defining the line between speech that
permissibly seeks to "facilitat[e]" a client's "development" of his or her gender
identity or sexual orientation, and speech that unlawfully seeks to "change" that
person's gender identity or sexual orientation.

221.    Given that "development" necessarily involves "change," the purported
distinction is incoherent, and thus leaves those authorized to bring enforcement
actions free to do so based on their personal predilections, or for discriminatory
purposes including disapproval of the beliefs, viewpoint, or messages of a particular
counselor.

222.    The prohibition on seeking to "change an individual's . . . gender
identity" also fails to provide adequate standards or guidelines to govern the actions
of those authorized to bring enforcement actions because the term "gender identity"
is undefined in the law and is vague.

223.    This vagueness is made worse rather than resolved by consulting
Washington State governmental position statements and publications in the field.
The Washington State Human Rights Commission "Guide to Sexual Orientation
and Gender Identity" published in 2014 asserts that "gender expression or identity"
"as defined in the law" means "having *or being perceived as having* a gender
identity, self-image, appearance, behavior, or expression . . ." (emphasis added).

Plaintiff's Verified Complaint
Case No. _____                               49

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

According to this meandering definition, an effort to "change" "gender identity" could include assisting a client to pursue her goal of changing gender-related aspects of her dress, or even of changing how other people *perceive* her gender identity.

224.    "Gender identity" has no clearer definition in the wider world. As noted above, in a 2016 rule interpreting Section 1556 of the Patient Protection and Affordable Care Act, the Department of Health and Human Services defined "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." *Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,376 (May 18, 2016) at 31,384.

225.    A publication sponsored by the ACLU, Human Rights Campaign, and National Education Association asserts that gender identity encompasses any "deeply-felt sense of being male, female, both or neither," and can include a "gender spectrum" "encompassing a wide range of identities and expressions." *Schools in Transition: A Guide for Supporting Transgender Students in K-12 Schools*, at 6-7.

226.    The National Center for Lesbian Rights contends that "Gender is comprised of a person's physical and genetic traits, their own sense of gender identity and their gender expression" and similarly asserts that gender identity "is better understood as a spectrum." That source goes on to say that an individual may have an "internal sense of self as male, female, both or neither," and that "each person is in the best position to define their own place on the gender spectrum."[14] Indeed, the medical text *Principles of Transgender Medicine and Surgery*, declares

---

[14] Asaf Orr et al., National Center for Lesbian Rights, *Schools in Transition: A Guide for Supporting Transgender Students in K-12 Schools* 5, 6 (2015), https://www.nclrights.org/wp-content/uploads/2015/08/Schools-in-Transition-2015-Online.pdf (last visited April 29, 2021).

that "Gender identity can be conceptualized as a continuum, a Mobius, or patchwork."[15]

227.   An individual who is unhappy with or uncertain about his or her "sense of being male, female, both or neither," or who wishes to evaluate and "define their own place on the gender spectrum," or who does not wish to live life with an identity as amorphous as a Mobius strip or a "patchwork," may well wish the aid of a professional counselor or therapist. But what conversation will comprise permissible "development" of that individual's place on that disorienting Mobius strip, and what will be condemned as an unlawful effort to "change" the individual's "gender identity," is unknowable.

228.   Because the Counseling Censorship Law fails to define "gender identity," and that term has no consistent definition in the wider law or medical science, the Counseling Censorship Law leaves those authorized to bring enforcement actions free to do so based on their personal predilections, or for discriminatory purposes including disapproval of the beliefs, viewpoint, or messages of a particular counselor.

229.   The prohibition on seeking to "change an individual's sexual orientation" also fails to provide adequate standards or guidelines to govern the actions of those authorized to bring enforcement actions, because the term "sexual orientation" is undefined in the Law and is vague.

230.   There is no definition of the term in the Counseling Censorship Law itself. The Washington State Human Rights Commission elsewhere states that "As defined in the law, 'sexual orientation' means heterosexuality, homosexuality, bisexuality, *and gender expression or identity*," bringing into the term "sexual

---

[15] *Principles of Transgender Medicine and Surgery* 43 (Randi Ettner, Stan Monstrey & Eli Coleman eds., 2nd ed. 2016).

Plaintiff's Verified Complaint
Case No. _____

51

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1  orientation" all the vagueness and ambiguity that is embedded in the term "gender

2  identity."

3      231.   There is equally no agreement in the scientific literature as to the

4  definition of "sexual orientation," or to what extent "orientations" may overlap or

5  blend from one to another. The APA Handbook of Sexuality and Psychology

6  cautions that "Sexual orientation is usually considered a multi-dimensional

7  construct" in which "aspects of sexual orientation . . . are not necessarily

8  concordant." (556). Diamond and Rosky (2016) warn that "it is important to note

9  that sexual orientation is not easy to define or measure," and "is a multifaceted

10  phenomenon" which cannot be simplified to mere "sexual attractions," but instead

11  incorporates (among other components) "sexual attractions, . . . sexual behavior,

12  and sexual identity," while "identity and behavior are structured by social context,

13  social constraints, and social opportunities." (3) This, say Diamond and Rosky,

14  "obviously poses a problem for research on the causes of sexual orientation." (3) It

15  also poses a severe problem for a counselor, therapist, or client who wishes to know

16  what type of counseling or therapeutic goals might be condemned as seeking to

17  change "sexual orientation."

18      232.   Because the Counseling Censorship Law fails to define "sexual

19  orientation," and that term has no consistent definition in the wider law or medical

20  science, the Counseling Censorship Law leaves those authorized to bring

21  enforcement actions free to do so based on their personal predilections, or for

22  discriminatory purposes including disapproval of the beliefs, viewpoint, or messages

23  of a particular counselor.

24      233.   The Counseling Censorship Law is further impermissibly vague

25  because it prohibits any "regime that *seeks* to change . . ." sexual orientation or

26  gender identity. The Law fails to provide any standards or guidelines as to whether

27  this refers to the subjective intent of the client, or that of the counselor, again

Plaintiff's Verified Complaint
Case No. _____                    52

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1  leaving unfettered discretion on this critical question to any person authorized to

2  bring an enforcement action, and inviting discriminatory enforcement.

3      234.   Indeed, a client's personal intention in raising a subject relating to

4  sexuality may or may not be known to the counselor, and may change from one

5  meeting to the next. Consequently, a counselor might face sanctions on the basis of

6  the shifting subjective thoughts and goals of his client that are beyond the

7  counselor's knowledge.

8      235.   The Counseling Censorship Law further fails to provide adequate

9  standards or guidelines to govern the actions of those authorized to bring

10  enforcement actions because it provides no definitions of terms "gender

11  expressions", "identity exploration", and "identity development," and provides no

12  information at all as to what "behaviors" a therapist may or may not help a client

13  attempt to change.

14      236.   In the absence of any clarity on these terms, almost any counseling

15  conversation that relates to gender, intimate relationships, or sexuality could be

16  accused of seeking to "change . . . sexual orientation or gender identity." Thus, the

17  failure of the Counseling Censorship Law to define these terms additionally leaves

18  those authorized to bring enforcement actions free to do so based on their personal

19  predilections, or for discriminatory purposes including disapproval of the beliefs,

20  viewpoint, or messages of a particular counselor.

21      237.   Meanwhile, the sanctions faced by therapists for violating the

22  Counseling Censorship Law are severe, ranging up to the revocation of their

23  licenses and the loss of their livelihoods.

24      238.   For these reasons, the Counseling Censorship Law is so vague on its

25  face that it deprives counselors and other "license holders" of Due Process rights

26  protected by the Fourteenth Amendment.

27

Plaintiff's Verified Complaint
Case No. _____

53

239.   The deprivation of these rights constitutes irreparable injury.

240.   Wherefore, Plaintiff respectfully requests that the Court grant declaratory and injunctive relief against the Counseling Censorship Law pursuant to 28 U.S.C. §§ 20201 and 2202, as set forth in the Prayer for Relief.

### COUNT IV

For Denial of Free Exercise Rights of Mr. Tingley
That Are Guaranteed by the First Amendment

241.   Plaintiff incorporates all paragraphs above by reference.

242.   Mr. Tingley's rights of free exercise protected by the First Amendment include the right to use his professional skills to assist his clients to live in accordance with their own religious beliefs, and equally to speak in the course of his professional work in a manner that is consistent with his own religious beliefs.

243.   The Counseling Censorship Law is premised on the belief that volitional change away from transgender identification, or away from same-sex attractions, is not possible or desirable, and that any attempt to make such a change is harmful.

244.   On the contrary, Plaintiff, like many adherents of Christianity and other historic religions, believes based on his faith (as well as based on science) that this "unchangeable" view of human nature is mistaken, that such change is possible, that God can and does work profound changes in individuals who desire and seek to change, and that change to a gender identity or sexual orientation aligned with an individual's reproductive biology can and does increase well-being at least in individuals who pursue this goal in obedience to their own religious convictions.

245.   Further, Plaintiff believes that as a Christian he has a religious obligation to use his time and professional skills to help fellow Christians who seek

Plaintiff's Verified Complaint
Case No. _____

54

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

his assistance to live consistently with the teachings of their shared faith. For clients who share his beliefs, he offers a safe harbor where they can be assured that their Christian worldview will not be subject to doubt, or even hostility, that they frequently experience in their daily lives.

246. As applied to Plaintiff, the Counseling Censorship Law substantially burdens his religious beliefs by requiring him to practice and speak in a manner that is contrary to his religious beliefs, prevents him from sharing his religious beliefs about the possibility of change with his clients in the course of discussions, and subjects him to a risk of severe sanctions for speaking to clients consistently with his religious beliefs.

247. Because the Counseling Censorship Law was aimed against counseling goals and speech which are well known to be primarily associated with counselors and therapists of faith, the Law is not neutral or generally applicable.

248. The Counseling Censorship Law is also not neutral or generally applicable because it imposes a viewpoint-based restriction on speech, directed against a viewpoint which is well known to be primarily associated with individuals of faith.

249. The Counseling Censorship Law does not represent the least restrictive means of furthering a compelling state interest as it is both overbroad and underinclusive.

250. By depriving Plaintiff of the right to practice his religious beliefs by speaking to clients on topics of gender identity and sexual attractions and change in a manner consistent with the teachings of his faith and that of his clients, the Counseling Censorship Law denies Plaintiff his rights of free exercise guaranteed by the First Amendment.

251. The deprivation of these rights constitutes irreparable injury.

252.   Wherefore, Plaintiff respectfully requests that the Court grant declaratory and injunctive relief against the Counseling Censorship Law pursuant to 28 U.S.C. §§ 20201 and 2202, as set forth in the Prayer for Relief.

### COUNT V

#### For Denial of Free Exercise Rights of Clients of Mr. Tingley That Are Guaranteed by the First Amendment

253.   Plaintiff incorporates all paragraphs above by reference.

254.   The right of free exercise under the First Amendment protects an individual's right to live in accordance with his or her religious beliefs.

255.   Based on the teachings of their Christian faith, some of Plaintiff's clients believe that they have a moral obligation to strive to bring their sense of gender identity into alignment with the biological sex that God gave to them, and/or to bring their sexual attractions and relationships in line with their reproductive biology—that is, into a heterosexual orientation, and/or to change their sexual behaviors by abstaining from sexual relationships outside the context of a heterosexual marriage.

256.   By threatening Plaintiff and all counselors, therapists, or other "license holders" with severe penalties including loss of their license and livelihood if they assist clients to pursue these faith-directed personal goals, the Counseling Censorship Law does, and was intended to, interfere with these clients' free exercise of their religion, in violation of the First Amendment.

257.   Because the Counseling Censorship Law was aimed against personal goals and goals for counseling which are well known to be primarily associated with individuals of faith, the Law is not neutral or generally applicable.

258.   The Counseling Censorship Law is also not neutral or generally applicable because it imposes a viewpoint-based restriction on speech, directed

Plaintiff's Verified Complaint
Case No. _____

56

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

against a viewpoint which is well known to be primarily associated with individuals of faith.

259.    The Counseling Censorship Law does not represent the least restrictive means of furthering a compelling state interest as it is both overbroad and underinclusive.

260.    Accordingly, the Counseling Censorship Law denies Plaintiff's Christian clients their rights to free exercise guaranteed by the First Amendment.

261.    The deprivation of these rights constitutes irreparable injury.

262.    Plaintiff has standing to assert and seek redress for the First Amendment rights of his clients that are violated by the enforcement of the Counseling Censorship Law, including his clients' free exercise rights.

263.    Wherefore, Plaintiff respectfully requests that the Court grant declaratory and injunctive relief against the Counseling Censorship Law pursuant to 28 U.S.C. §§ 20201 and 2202, as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment against Defendants and grant the following relief:

(A)    A declaration that—both facially and as applied—the Counseling Censorship Law violates the First Amendment right to free speech of Plaintiff Mr. Tingley and of his clients who seek his professional assistance to achieve comfort with a gender identity congruent with the client's biological sex, or to reduce unwanted same-sex attraction and/or develop or increase opposite-sex attractions, or to change sexual behaviors of any sort;

(B)    A declaration that—both facially and as applied—the Counseling Censorship Law violates the free exercise rights of Plaintiff Mr. Tingley and of his clients who seek his professional assistance to achieve comfort with a gender identity congruent with the client's biological sex, or to reduce unwanted same-sex attraction

Plaintiff's Verified Complaint
Case No. _____

57

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

and/or develop or increase opposite-sex attractions, or to change sexual behaviors of any sort;

(C)   A declaration that, because it is so vague that it does not provide fixed legal standards as to what is prohibited and what is not, the Counseling Censorship Law facially violates the Due Process rights of Mr. Tingley protected by the Fourteenth Amendment.

(D)   That this Court enter a preliminary injunction and permanent injunction barring all enforcement of the Counseling Censorship Law;

(E)   That this Court award Plaintiff costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

(F)   That this Court issue the requested injunctive relief without a condition of bond or other security being required of Plaintiff;

(G)   That this Court grant any other relief that it deems equitable and just in the circumstances; and

(H)   That this Court retain jurisdiction over this matter for the purpose of enforcing its orders.

Respectfully submitted this 13th day of May, 2021.

By: _s/ Gregory D. Esau_

Gregory D. Esau (WSBA #22404)
ELLIS | LI | MCKINSTRY
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101
206-682-0565 (T)
gesau@elmlaw.com

By: _s/ Kristen K. Waggoner_

Kristen K. Waggoner (WSBA #27790)
Roger G. Brooks* (NC Bar # 16317)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020 (T)
480-444-0028 (F)
kwaggoner@adflegal.org
rbrooks@adflegal.org

Plaintiff's Verified Complaint
Case No. _____

58

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

David A. Cortman* (GA Bar #188810)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
(770) 339-0774 (T)
(770) 339-6744 (F)
dcortman@ADFlegal.org

*Pro Hac Vice applications filed concurrently

*Attorneys for Plaintiff*

Plaintiff's Verified Complaint
Case No. _____

59

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1
2
3

## VERIFICATION OF COMPLAINT

4
5
6
7
8

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.

9

Executed this 12th day of May, 2021.

10
11
12

Brian Tingley, Plaintiff

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Plaintiff's Verified Complaint
Case No. _____-_____

60

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020