1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

| | | |
|---|---|---|
| **BRIAN TINGLEY**, | ) | Case No. __3:21-cv-5359___ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF'S MOTION FOR** |
| | ) | **PRELIMINARY INJUNCTION AND** |
| **ROBERT W. FERGUSON**, in his official | ) | **MEMORANDUM IN SUPPORT** |
| capacity as Attorney General for the State of | ) | |
| Washington; **UMAIR A. SHAH**, in his official | ) | NOTE ON MOTION CALENDAR: |
| capacity as Secretary of Health for the State of | ) | Friday, June 4, 2021 |
| Washington; and **KRISTIN PETERSON** in her | ) | |
| official capacity as Assistant Secretary of the | ) | |
| Health Systems Quality Assurance division of the | ) | ORAL ARGUMENT REQUESTED |
| Washington State Department of Health, | ) | |
| | ) | |
| Defendants. | ) | |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. 3:21-cv-5359_____

i

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................. 1

Statement of Facts....................................................................................................... 2

    A.    Plaintiff Tingley and his clients ................................................ 2

    B.    Religious beliefs concerning sexuality, identity, and the possibility of change ..... 3

    C.    Scientific knowledge and lack of knowledge concerning changes in sexual attractions and gender identity ................................................ 4

    D.    Tingley's counseling relating to sexual attractions and gender identity ................. 5

    E.    The Counseling Censorship Law ........................................... 6

Argument .................................................................................................................... 7

Governing Legal Standard ........................................................................................... 7

I.    The Counseling Censorship Law Violates the Free Speech Rights of Plaintiff Tingley Because it Bans Protected Speech Based on Content and Viewpoint................... 7

    A.    The Law regulates speech, not conduct. ................................... 7

    B.    The Law is subject to strict scrutiny because it censors speech based on content and viewpoint. ................................................ 8

        1.    The Law censors speech based on content. ............................. 8

        2.    The Law discriminates based on viewpoint................................ 9

        3.    The speech targeted by the Law is not less protected because it is speech by professionals or it is directed at minors. .................................. 10

    C.    The Counseling Censorship Law cannot survive strict scrutiny.......................... 11

        1.    The Counseling Censorship Law cannot survive strict scrutiny because, as enforced against pure speech, it does not further any cognizable governmental interest. ................................................ 12

        2.    The Counseling Censorship Law cannot survive strict scrutiny because it is not narrowly tailored. .......................................... 13

        3.    The Counseling Censorship Law cannot survive strict scrutiny because it is not the least-restrictive alternative. ..................................... 15

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

ii

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

II.     The Counseling Censorship Law Violates the Free Speech Rights of Clients of
        Plaintiff Tingley. ............................................................................................ 16

        A.     Plaintiff has standing to assert the First Amendment rights of his clients............ 16

        B.     The Counseling Censorship Law violates the First Amendment right of
               clients of Tingley to receive desired information and counsel. ........................... 17

III.    The Counseling Censorship Law Violates the Due Process Rights of Plaintiff
        Because It Grants Unbridled Discretion in Enforcement. ................................. 17

IV.     The Counseling Censorship Law Violates the Free Exercise Rights of Mr. Tingley
        and His Clients............................................................................................... 18

        A.     The Counseling Censorship Law violates free exercise rights because it is
               not neutral. ...................................................................................................... 19

        B.     The Counseling Censorship Law violates free exercise rights regardless
               of whether it is "neutral and of general applicability." ......................................... 20

V.      The Remaining Factors Favor Granting a Preliminary Injunction. ................... 21

Conclusion ................................................................................................................... 21

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

iii

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

# TABLE OF AUTHORITIES

**CASES**

*American Beverage Association v. City and County of San Francisco*,
    916 F.3d 749 (9th Cir. 2019) ...................................................................7

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)...........................................................................11

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969)...........................................................................12

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011)......................................................................11, 14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)......................................................................14, 19

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002) ..................................................10, 11, 13

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972).......................................................................13, 16

*Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990)...........................................................................19

*FCC v. League of Women Voters of California*,
    468 U.S. 364 (1984)...........................................................................12

*Florida Star v. B.J.F.*,
    491 U.S. 524 (1989)...........................................................................14

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006)...........................................................................12

*Griswold v. Connecticut*,
    381 U.S. 479 (1965)...........................................................................17

*Herceg v. Hustler Magazine, Inc.*,
    814 F.2d 1017 (5th Cir. 1987) .............................................................12

*Holder v. Humanitarian Law Project*,
    561 US 1 (2010).................................................................................17

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
    565 U.S. 171 (2012)......................................................................19, 20

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____
      iv

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995)......................................................................................13

*IMDb.com v. Becerra*,
    962 F.3d 1111 (9th Cir. 2020) ................................................................8, 10

*Kolender v. Lawson*,
    461 U.S. 352 (1983)......................................................................................17

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)......................................................................................16

*Linmark Associates, Inc. v. Willingboro Township*,
    431 U.S. 85 (1977)........................................................................................15

*Maryland v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984)................................................................................16, 17

*McCullen v. Coakley*,
    573 U.S. 464 (2014)..................................................................................8, 12

*Miller v. Reed*,
    176 F.3d 1202 (9th Cir. 1999) .....................................................................21

*NAACP v. Button*,
    371 U.S. 415 (1963)........................................................................................8

*National Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)..............................................................1, 8, 10, 13, 16

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ..................................................1, 2, 8, 9, 10

*Pickup v. Brown*,
    728 F.3d 1042 (9th Cir. 2013) .......................................................................7

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)........................................................................8, 9, 10, 11

*Republican Party of Minnesota v. White*,
    416 F.3d 738 (8th Cir. 2005) .......................................................................11

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995)........................................................................................9

*Sammartano v. First Judicial District Court*,
    303 F.3d 959 (9th Cir. 2002) .........................................................................7

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

v

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board,*
  502 U.S. 105 (1991) ..................................................................................14

*Snyder v. Phelps,*
  562 U.S. 443 (2011) ..................................................................................13

*Texas v. Johnson,*
  491 U.S. 397 (1989) ...............................................................................2, 13

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  137 S. Ct. 2012 (2017) .............................................................................20

*United States v. Alvarez,*
  567 U.S. 709 (2012) .............................................................................12, 15

*United States v. Playboy Entertainment Group, Inc.,*
  529 U.S. 803 (2000) .............................................................................15, 16

*United States v. Stevens,*
  559 U.S. 460 (2010) ..................................................................................14

*United States v. Swisher,*
  811 F.3d 299 (9th Cir. 2016) ....................................................................13

*United States v. Williams,*
  553 U.S. 285 (2008) ..................................................................................17

*Victory Processing, LLC v. Fox,*
  937 F.3d 1218 (9th Cir. 2019) ...............................................................8, 11

*Video Software Dealers Association v. Schwarzenegger,*
  556 F.3d 950 (9th Cir. 2009) ....................................................................15

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer*
  *Council, Inc.,*
  425 U.S. 748 (1976) ..................................................................................17

*Warth v. Seldin,*
  422 U.S. 490 (1975) ..................................................................................17

*West Virginia State Board of Education v. Barnette,*
  319 U.S. 624 (1943) ....................................................................................9

*Whitney v. California,*
  274 U.S. 357 (1927) ..................................................................................15

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................7

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

vi

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

*Wollschlaeger v. Governor, Fla.,*
    848 F.3d 1293 (11th Cir. 2017) ............................................................................8

**STATUTES**

Wash. Admin. Code § 246.490.075 ........................................................................6

Wash. Rev. Code § 18.130.020.......................................................................1, 6, 9

Wash. Rev. Code § 18.130.160.................................................................................6

Wash. Rev. Code § 18.130.180.........................................................................1, 6

Wash. Rev. Code § 26.04.010.................................................................................6

Wash. Rev. Code § 9.02.100.................................................................................6

Wash. Rev. Code § 9A.44.................................................................................6

**OTHER AUTHORITIES**

Richard M. Weaver, *Ideas Have Consequences* (Univ. Chi. Press, 1948) ...................................12

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

vii

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

Plaintiff Brian Tingley moves under Fed. R. Civ. P. 65 to preliminarily enjoin Defendants' enforcement of Senate Bill 5722, codified at Wash. Rev. Code §§ 18.130.020 and 18.130.180 (the "Counseling Censorship Law"), both facially and as applied to Plaintiff, because the Counseling Censorship Law censors private conversations between a counselor and his clients in violation of the rights of both Brian Tingley and his clients secured under the First and Fourteenth Amendments of the U.S. Constitution.

## Preliminary Statement

"Speech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Inst. of Family & Life Advocates v. Becerra (NIFLA)*, 138 S. Ct. 2361, 2371-72 (2018). Brian Tingley, a licensed marriage and family counselor, moves this Court to enjoin the enforcement, both on its face and as applied, of Washington State's Senate Bill 5722, codified at Wash. Rev. Code §§ 18.130.020 and 18.130.180 ("the Counseling Censorship Law" or "the Law")—a law that censors private conversations between individuals and their chosen counselors in violation of the First and Fourteenth Amendment rights of both Mr. Tingley and his clients.

The client-counselor relationship requires trust and openness between client and counselor as they explore together the client's most intimate concerns and personal goals. It is the last place where government agents should intrude to declare disfavored topics and ideas off limits. Yet the Counseling Censorship Law does just that. More, many people believe that matters of sexuality and gender identity implicate not merely neutral feelings and desires, but morality and indeed obedience to God. Yet if a client is experiencing same-sex attractions, or a sense of gender identity that is discordant with his or her biological sex, the Counseling Censorship Law flatly prohibits the counselor from offering any thoughts to assist the client in pursuing even a personally chosen goal of reducing same-sex attraction, or achieving comfort in a gender identity congruent with the client's physical body and reproductive nature.

The Washington State legislature may find such beliefs or counsel archaic, objectionable, or even dangerous. But "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

1

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

idea itself offensive or disagreeable." *Otto v. City of Boca Raton*, 981 F.3d 854, 872 (11th Cir. 2020), quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Because even the prospect of enforcement chills free and open discussion between Mr. Tingley and his clients, and because as detailed below Mr. Tingley has a strong probability of prevailing on the merits, enforcement of the Counseling Censorship Law should be preliminarily enjoined pending resolution of this case on the merits.

**Statement of Facts**

A.    Plaintiff Tingley and his clients

Plaintiff Brian Tingley is a licensed Marriage and Family Therapist who has 20 years' experience counseling clients on a wide range of complex and sensitive topics. (Cmpl. ¶ 70; Tingley Decl. ¶ 3.) Mr. Tingley works with his clients to provide support, challenge, and feedback to help achieve the life and personal goals that they choose for themselves. (Cmpl. ¶ 79; Tingley Decl. ¶ 14.) Mr. Tingley counsels both adults and minors. In all cases, his counseling consists of nothing but conversation: asking his clients questions, listening empathetically, and offering suggestions as to how they can better understand themselves and their relationships and emotions, so that they can make changes that they desire, become the people they want to be, and live the lives that they want to live. (Cmpl. ¶ 76; Tingley Decl. ¶ 13-14, 66.)

Mr. Tingley is a Christian. He does not seek to impose his faith or priorities on his clients, but his faith inevitably informs his understanding of human nature. (Cmpl. ¶ 27; Tingley Decl. ¶ 9.) Mr. Tingley's website states that his practice group consists of Christian counselors, who share a goal of helping clients achieve "personal and relational growth as well as healing for the wounded spirit, soul, and body through the healthy integration of relational, psychological, and spiritual principles with clinical excellence." (Cmpl. ¶ 70; Tingley Decl. ¶ 8.)

Most of Mr. Tingley's clients share his Christian faith, and many select him and trust his counsel precisely because he shares their faith-based convictions and worldview. (Cmpl. ¶ 71-74; Tingley Decl. ¶ 10-12.) Mr. Tingley only works with clients who attend voluntarily, and in pursuit of the goals or objectives that they have set for themselves. (Cmpl. ¶ 79-80; Tingley

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

2

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

Decl. ¶ 14-15.) No client has ever filed any complaint against Mr. Tingley. (Cmpl. ¶ 174; Tingley Decl. ¶ 16.)

  B. <u>Religious beliefs concerning sexuality, identity, and the possibility of change</u>

  Many Christians, including Mr. Tingley and many of his clients, believe that their identity is primarily defined by who God has created them to be, and what God has said about them, as revealed through biblical teaching, as opposed to being founded on their own feelings, determinations or wishes. (Cmpl. ¶ 127-128; Tingley Decl. ¶ 26-30, 32.) Thus, many Christians believe that living consistently with their faith is more fundamental to achieving their own happiness, stability, and satisfaction than pursuing subjective desires or feelings that would conflict with biblical teaching. (Cmpl. ¶ 67-68, 129-130, 155-158; Tingley Decl. ¶ 21-22, 40.) This central tenet of the Christian faith has many applications, including leading Christians to prioritize the teachings of their faith over their romantic and sexual desires both because they believe this to be a divine command, and in the belief that doing so will lead to their own flourishing and well-being. (Cmpl. ¶ 126-127, 129, 147; Tingley Decl. ¶ 23-24, 60.)

  Moreover, Christians believe that they are to obey God's laws and instruction regardless of whether they experience conflicting desires or feelings. They accept biblical teachings that pursuing a life of faith necessarily requires Christians to "deny themselves" in many aspects of life (Matthew 16:24), and to give up behaviors that might otherwise appear desirable. (Cmpl. ¶ 126-128, 130, 146-147; Tingley Decl. ¶ 30, 72.)

  Also central to Christian faith is the belief that change–even radical change–is possible: that God transforms the hearts and minds of faithful Christians so that they can live more consistently with the teachings of their faith. Christians believe that they are not captive to their own desires, but rather that with God's help, they can change to live a life that is faithful to God's commandments. (Cmpl. ¶ 127-129, 147; Tingley Decl. ¶ 31-32.)

  Biblical teaching specifically addresses sex and sexuality. Consistent with that teaching, Mr. Tingley and many of his Christian clients believe that the sex that each of us receives at the

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

3

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

moment of conception is not an accident, an insignificant detail, or a personal choice, but rather is a gift of God. (Tingley Decl. ¶ 27.) Thus obedience, well-being, and happiness for each individual will include acceptance of and gratitude for the particular sex that God has given to him or her. (Cmpl. ¶ 111; Tingley Decl. ¶ 26-27, 40, 51.)

Likewise, many Christians believe that sexual relationships are right and healthy only in a very specific context—namely between a man and a woman, committed to each other for life in marriage. (Cmpl. ¶ 126; Tingley Decl. ¶ 29.) The joining of male and female in marriage to conceive children and raise up each next generation is believed to be a great blessing, a great calling, and a sacred thing. (Cmpl. ¶ 125; Tingley Decl. ¶ 28.) For many believers, any sexual relationship outside of this context–regardless of how much it might be desired–is believed to be contrary to the teachings of the Christian faith. (Cmpl. ¶ 126-127; Tingley Decl. ¶ 30.)

C.   Scientific knowledge and lack of knowledge concerning changes in sexual attractions and gender identity

Contrary to what is commonly asserted, the possibility of change in sexual orientation and gender identity is not an area in which science and faith are in conflict.

As Dr. Rosik details in his declaration, in recent years leading researchers in the field have acknowledged–indeed proclaimed–that it is no longer possible to maintain that change in sexual orientation is impossible or even rare. (Rosik Decl. ¶¶ 7-9, 15-28.)

Notably, internationally respected authors Professors Lisa Diamond and Clifford Rosky, who count themselves advocates for LGBTQ issues, reviewed the scientific literature in 2016 and concluded that "arguments based on the immutability of sexual orientation are unscientific, given that scientific research does not indicate that sexual orientation is uniformly biologically determined at birth or that patterns of same-sex and other-sex attractions remain fixed over the life course." Instead, Diamond and Rosky reported that "Studies unequivocally demonstrate that same-sex and other-sex attractions do change over time in some individuals," and that the evidence for this is now even "indisputable." (Rosik Decl. ¶¶ 17.) Indeed, Diamond and Rosky cite multiple longitudinal studies which found that many teens and young adults who initially

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

4

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1   experience some degree of same-sex attractions identified as exclusively heterosexual within a
2   few years. (Rosik Decl. ¶¶ 22.)

3          Similarly, as Dr. Levine details in his declaration, many young people who experience
4   gender dysphoria or feelings of cross-gender identification ultimately resolve to identifying with
5   their biological sex—as many as 80-98%, in the case of young children. (Levine Decl. ¶¶ 60.)
6   Thus, even apart from faith considerations, an individual who experiences some same-sex
7   attractions but hopes to ultimately stabilize with predominately heterosexual attractions, or who
8   experiences gender dysphoria but hopes to ultimately achieve comfort with an identity aligned
9   with his or her biological sex and reproductive potential, is not hoping for an impossible thing.
10  And such individuals may well and reasonably desire to have a trained and trusted counselor
11  assist them as they pursue that personal goal.

12          D.     Tingley's counseling relating to sexual attractions and gender identity
13          Among the wide range of problems and goals that clients bring into his office, some
14  clients—including clients younger than 18—have asked Mr. Tingley to assist them to reduce
15  same-sex attractions, to achieve comfort with their biological sex, or to desist from sexual
16  behaviors such as addiction to pornography, or ongoing sexual activity, which the clients believe
17  are wrong. (Cmpl. ¶ 108-122, 158-165, 167-172; Tingley Decl. ¶¶ 37-51, 53-64, 67-72.) As Dr.
18  Rosik explains in his accompanying expert declaration, such goals frequently derive from the
19  client's wishes to live consistently with his or her religious beliefs. (Rosik Decl. ¶¶ 36, 48.) Mr.
20  Tingley currently has and expects to continue to receive clients with similar wishes, objectives,
21  and motivations. (Cmpl. ¶ 123, 164-166, 173; Tingley Decl. ¶ 52, 57, 66, 73.) Mr. Tingley
22  wishes to continue supporting these clients for professional, religious, and human reasons.
23  (Cmpl. ¶ 175; Tingley Decl. ¶ 74.)

24          Mr. Tingley never promises clients that he can solve the issues they bring to him, but he
25  has often seen his clients make progress toward their goals on these issues. (Cmpl. ¶ 116, 163,
26  165, 169, 172-173; Tingley Decl. ¶ 45, 62-64, 69, 72.)

27

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

5

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

E.      The Counseling Censorship Law

The Counseling Censorship Law restricts "performing conversion therapy on a patient under age eighteen" to the list of conduct, acts, or conditions that would constitute "unprofessional conduct" for a "license holder." Wash. Rev. Code ("RCW") § 18.130.180.

While the Law defines "Conversion therapy" as "a regime that seeks to change an individual's sexual orientation or gender identity"—which specifically includes "efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex," RCW § 18.130.020—it excepts "counseling. . . that provide[s] acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development that do[es] not seek to change sexual orientation or gender identity." *Id*. Yet the Law does not define a boundary between "change" and "exploration and development."

The Law threatens severe penalties, including fines up to $5,000 for each violation, suspension from practice, and even the loss of license and livelihood. RCW § 18.130.160.

Thus, the Counseling Censorship Law expressly prevents counselors from speaking, and minor clients from hearing, proscribed ideas and messages even if the counselor (and client) believes them to be true. It further prevents clients who desire a prohibited goal from obtaining help from trained and trusted counselors as they pursue their goals.

Washington State seeks to deprive minor clients of these rights even as it authorizes these same minors (from age 16 upwards) to engage in sexual activity with a person of any older age— entailing the potentially lifechanging implications of becoming a parent (RCW § 9A.44); to obtain an abortion without parental consent (at any age) (RCW § 9.02.100); to change their gender on their birth certificate (at any age) (Wash. Admin. Code § 246.490.075); and even to marry (from age 17) (RCW § 26.04.010). Moreover, there is no bar in Washington State on minors at any age undergoing irreversible and life-altering hormonal or surgical measures that would purport to "affirm" a transgender identity.

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

6

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

### Argument

The Counseling Censorship Law infringes rights of Mr. Tingley, and of his clients, that are protected by the First and Fourteenth Amendments. At a minimum a preliminary injunction should be entered categorically enjoining enforcement of the law due to its violation of Due Process, and enjoining enforcement of the Law against Mr. Tingley due to its violations of the First Amendment.

### Governing Legal Standard

To obtain a preliminary injunction, the plaintiff must show that (1) he is "likely to succeed on the merits," (2) he is "likely to suffer irreparable harm," (3) "the balance of equities tips in his favor," and (4) the requested injunction "is in the public interest." *Am. Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). But when First Amendment rights are at risk, the analysis essentially reduces to a single question—whether the plaintiff is likely to succeed on the merits. This is because even the brief loss of First Amendment rights causes "irreparable injury" and tilts "the balance of hardships … sharply in [the plaintiff's] favor," and "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 758 (emphasis added) (cleaned up); *see also Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002) ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles.").

Because Plaintiff has a high likelihood of success on the merits, enforcement of the Counseling Censorship law should be preliminarily enjoined.

I.   The Counseling Censorship Law Violates the Free Speech Rights of Plaintiff Tingley Because it Bans Protected Speech Based on Content and Viewpoint.

A.   The Law regulates speech, not conduct.

In *Pickup v. Brown*, 728 F.3d 1042, 1055-1056 (9th Cir. 2013), a panel of the Ninth Circuit held that prohibited counseling was conduct, not speech. But as the Eleventh Circuit observed when confronted with an attempt to restrict what doctors might say to their patients,

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

7

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

"characterizing speech as conduct is a dubious constitutional enterprise," *see Wollschlaeger v. Governor, Fla.,* 848 F.3d 1293, 1308-1309 (11th Cir. 2017), and the logic of *Pickup* has since been rejected by the Supreme Court. *NIFLA*, 138 S. Ct. at 2373-74; *see also NAACP v. Button*, 371 U.S. 415, 439 (1963) ("[A] State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights.").

The Counseling Censorship Law regulates speech facially and as applied here. *All* that Mr. Tingley does with his clients is speak with them. Yet these conversations are prohibited by the Counseling Censorship Law. Putting it bluntly, "[i]f speaking to clients is not speech, the world is truly upside down." *Otto*, 981 F.3d at 866.

B. <u>The Law is subject to strict scrutiny because it censors speech based on content and viewpoint.</u>

**1.    The Law censors speech based on content.**

A law that restricts speech based on its content is presumptively unconstitutional and must overcome strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also IMDb.com v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020).

A restriction is content-based if it facially draws distinctions based on a speaker's message; it cannot be justified without reference to speech's content; or it was adopted because of disagreement with the message conveyed. *Reed*, 576 U.S. at 163-164. *See also IMDb.com*, 962 F.3d at 1120 (A statute is content-based "if it, by its very terms, singles out particular content for differential treatment.") (cleaned up); *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019) ("[A] law is content-based because it explicitly draws distinctions based on the message a speaker conveys."). A reliable way of determining whether a restriction is content-based is if enforcement authorities must necessarily "examine the content of the message that is conveyed" to know whether the Law has been violated. *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (citation omitted).

The Counseling Censorship Law discriminates based on content under any of these articulations. The first step in any enforcement investigation under the Law must be to inquire

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

8

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1    into the *content* of what was discussed in confidence behind the closed door of the counseling

2    room. *See Otto*, 981 F.3d at 861 ("[B]ecause the ordinances depend on what is said, they are

3    content-based restrictions that must receive strict scrutiny.").

4                    **2.        The Law discriminates based on viewpoint.**

5             A law discriminates based on viewpoint when it regulates speech "based on 'the specific

6    motivating ideology or the opinion or perspective of the speaker.'" *Reed,* 576 U.S. at 168-69

7    (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Such an

8    application is a particularly "egregious form of content discrimination." *Id*. The Supreme Court

9    has condemned viewpoint discrimination in the strongest possible terms; warning that "Those

10   who begin coercive elimination of dissent soon find themselves exterminating dissenters." *W.*

11   *Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943).

12            The Counseling Censorship Law discriminates based on viewpoint. The Law does not

13   ban *all* counseling concerning sexual orientation, gender identity, or sexual "behaviors." Quite

14   the contrary, it explicitly excepts "counseling or psychotherapies that provide acceptance,

15   support, and understanding . . . of clients' . . . identity exploration" so long as they "do not seek

16   to change sexual orientation or gender identity." Wash. Rev. Code. § 18.130.020(4)(b).

17            But it threatens severe punishment and even loss of license and livelihood if a counselor

18   dares to provide counsel—desired and requested by his client—that "seek[s] to change [an

19   individual's] sexual orientation or gender identity." *Id.* The law very expressly seeks to silence

20   one viewpoint in the counseling room: the viewpoint that feelings and behaviors relating to

21   sexual orientation and gender identity can change; that individuals are not necessarily prisoners

22   of undesired feelings; and that individuals are not irrevocably predestined to violate their own

23   religious convictions. "The [Law] thus codif[ies] a particular viewpoint . . . and prohibit[s] the

24   therapist[] from advancing any other perspective when counseling clients." *Otto*, 981 F.3d at

25   864.

26            But this the Washington legislature may not do. "The First Amendment exists precisely

27   so that speakers with unpopular ideas do not have to lobby the government for permission before

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____                9

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

they speak." *Otto*, 981 F.3d at 864. Instead, "[t]he test of truth is the power of an idea to get itself accepted in a competitive marketplace of ideas and the people lose when the government is the one deciding which ideas should prevail." *NIFLA*, 138 S. Ct. at 2375 (cleaned up).

### 3. The speech targeted by the Law is not less protected because it is speech by professionals or it is directed at minors.

The strict scrutiny which such a content- and viewpoint-based law must survive can neither be excused nor lessened based on an argument that the law censors only a less protected category of "professional speech," as was suggested in *Pickup*. The Supreme Court in *NIFLA* expressly rejected the idea that professional speech is less protected, emphasizing that it has "long protected the First Amendment rights of professionals," "stressed the danger of content-based regulations in the fields of medicine and public health" where "[d]octors help patients make deeply personal decisions and . . . candor is crucial," and noted that attempts to censor the content of "doctor-patient discourse" have historically been characteristic of totalitarian regimes such as those of Nazi Germany, China under the Cultural Revolution, and Romania's Nicolae Ceausescu. 138 S. Ct. at 2374 (cleaned up). "States cannot choose the protection that speech receives under the First Amendment [by electing to regulate a profession], as that would give them a powerful tool to impose invidious discrimination of disfavored subjects." *Id.* at 2375 (cleaned up); *see also IMDb.com*, 962 F.3d at 1121 ("[S]tate legislatures do not have freewheeling authority to declare new categories of speech outside the scope of the First Amendment.") (cleaned up).

Following *NIFLA*, the Eleventh Circuit recently held that an ordinance nearly identical to the Counseling Censorship Law was "presumptively unconstitutional," *Otto*, 981 F.3d at 868, *quoting Reed*, 576 U.S. at 163, and in fact could not stand. "[T]he First Amendment does not allow communities to determine how their neighbors may be counseled about matters of sexual orientation or gender." *Otto*, 981 F.3d at 871.

Similarly, with *Pickup*'s rationale now rejected, this Court's strong teaching in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), stands and is directly on point. There, striking a law that

1  sought to censor what advice physicians could give to patients about the medical use of

2  marijuana, the Ninth Circuit emphasized "the core First Amendment values of the doctor-patient

3  relationship," and that "professional speech may be entitled to the strongest protection our

4  Constitution has to offer." *Conant*, 309 F.3d at 637 (cleaned up). It found the restriction on the

5  speech between doctor and patient there to be both content- and viewpoint-based, applied strict

6  scrutiny, and invalidated the law. *Id*. at 637-639.

7        Nor is the Law excused from strict scrutiny because it limits its censorship to

8  conversations with minors. Minors themselves "are entitled to a significant measure of First

9  Amendment protection," and a legislature does not possess "a free-floating power to restrict the

10  ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794

11  (2011) (cleaned up). Speech cannot be suppressed "solely to protect the young from ideas or

12  images that a legislative body thinks unsuitable for them." *Id*. at 795 (cleaned up).

13        C.    <u>The Counseling Censorship Law cannot survive strict scrutiny.</u>

14        To survive strict scrutiny, Defendants must prove that the Counseling Censorship Law

15  "furthers a compelling interest and is narrowly tailored." *Reed*, 576 U.S. at 171 (cleaned up).

16  Defendants bear the burden of establishing this both on the merits and for purposes of defeating a

17  request for preliminary injunction. *Ashcroft v. ACLU*, 542 U.S. 656, 660-61, 666 (2004). The

18  State must "specifically identify an 'actual problem'" and show that restricting "speech [is]

19  actually necessary to the solution." *Brown*, 564 U.S. at 799 (cleaned up).

20        "A narrowly tailored regulation … actually advances the state's interest (is necessary),

21  does not sweep too broadly (is not overinclusive), does not leave significant influences bearing

22  on the interest unregulated (is not underinclusive), and" cannot "be replaced" by a regulation

23  "that could advance the interest as well with less infringement of speech (is the least-restrictive

24  alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005); *see Victory

25  Processing*, 937 F.3d at 1227-1228 (same).

26        In an as-applied challenge to a restriction of First Amendment rights, government must

27  also prove that the compelling interest would be injured if an exception were granted to the

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

11

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

challenger. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-32 (2006) (applying the compelling interest test in the context of RFRA). Otherwise, application of the law in that particular setting cannot further the interest.

The Counseling Censorship Law fails these requirements at every point.

> **1.     The Counseling Censorship Law cannot survive strict scrutiny because, as enforced against pure speech, it does not further any cognizable governmental interest.**

The Counseling Censorship Law fails strict scrutiny at the threshold because it serves *no* cognizable interest at all as applied against counseling speech. There is no statistically valid evidence that counseling of the type that Mr. Tingley provides is either harmful or ineffective. (*See* Rosik Decl. ¶¶ 29-53; Levine Decl. ¶¶ 38-44, 83-85.) But more fundamentally, arguments about harm and efficacy are irrelevant as a matter of law. It is a lodestar of First Amendment jurisprudence that censorship cannot be justified on the plea that bad ideas cause harm. No doubt "ideas have consequences,"[1] but under our laws this provides no footing for censorship unless and until that risk of harm rises to the high and immediate urgency defined by the "clear and present danger" test. *See Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969) (per curiam) (general advocacy of armed resistance not sufficient to justify punishment for speech); *see also Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1024 (5th Cir. 1987) (rejecting the suggestion that "a less stringent standard than the *Brandenburg* test be applied in cases involving non-political speech that has actually produced harm")

It is equally clear that the State of Washington does not have a cognizable interest in preventing the dissemination of ideas concerning personal, philosophical, scientific, and religious topics on the grounds that such ideas are (or it believes them to be) false or offensive. *McCullen*, 573 U.S. at 476 (citing *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)) ("[T]he First Amendment's purpose" is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail."); *United States v. Alvarez*, 567 U.S. 709, 729 (2012)

---

[1] *See* Richard M. Weaver, *Ideas Have Consequences* (Univ. Chi. Press, 1948).

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

12

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

("Truth needs neither handcuffs nor a badge for its vindication."); *United States v. Swisher*, 811 F.3d 299, 317-18 (9th Cir. 2016) (adopting the *Alvarez* finding that "lies do not fall into a category of speech that is excepted from First Amendment protection"); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (The "bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Snyder v. Phelps*, 562 U.S. 443, 458, (2011) ("[S]peech cannot be restricted simply because it is upsetting or arouses contempt."); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) ("[T]he point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.").

However much the State of Washington may dislike the ethics, goals, and even religious beliefs of clients seeking counsel for unwanted sexual attractions and identity, "the [client's] freedom to learn about them, fully to comprehend their scope and portent, and to weigh them against the tenets of the 'conventional wisdom,' may not be abridged." *Eisenstadt v. Baird*, 405 U.S. 438, 457 (1972) (Douglas, J., concurring). The Ninth Circuit has made the same point, denying that the state has power to paternalistically regulate speech between doctor and patient to prevent individuals from making "bad decisions." *Conant*, 309 F.3d at 637.

### 2. The Counseling Censorship Law cannot survive strict scrutiny because it is not narrowly tailored.

The Counseling Censorship Law in its present form must also fail because it is not narrowly tailored. "Precision must be the touchstone when it comes to regulations of speech, which so closely touch our most precious freedoms." *NIFLA*, 138 S. Ct. at 2376 (cleaned up).

The Senate Bill Report behind SB 5722 expressed concern about supposed practices that "induce nausea, vomiting, and other responses from youth, while showing them erotic images." No specific instances are documented in the Report. (Cmpl. ¶ 56.) The House Report further asserted that problematic practices include "physical abuse of children." (Cmpl. ¶ 56.) Perhaps Washington State has the power to regulate such conduct and procedures. But the scope of the

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

13

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1  State's power to regulate such conduct by health professionals is not before this Court. Instead,

2  the Counseling Censorship Law prohibits even simple, voluntary conversation if that

3  conversation is directed toward a goal and viewpoint of which the legislature disapproves. The

4  Counseling Censorship Law is sweepingly overbroad with respect to any legitimate

5  governmental interest. *United States v. Stevens*, 559 U.S. 460, 473 (2010) (a law is overbroad if

6  "a substantial number of its applications are unconstitutional, judged in relation to the statute's

7  plainly legitimate sweep") (citation omitted); *Simon & Schuster, Inc. v. Members of N.Y. State

8  Crime Victims Bd.*, 502 U.S. 105, 121 (1991) (law requiring a criminal to pay income derived

9  from describing crime into an escrow account was overbroad because it applied to any reference

10 to crimes).

11     The Law is also *under*inclusive with respect to its claimed goals. If a statute is

12 underinclusive, this negates the legitimacy of the law in at least three distinct ways. First, it

13 contradicts the claim that the law is "narrowly tailored" to the harm it purports to address.

14 *Brown*, 564 U.S. at 799-804. Second, the poor fit between the law and the alleged harm "raises

15 serious doubts about whether [the government] is, in fact, serving, with this statute, the

16 significant interests which [it] invokes" to justify the law. *Florida Star v. B.J.F.*, 491 U.S. 524,

17 540 (1989). Third, underinclusiveness may justify an inference that the law was in fact targeted

18 against religiously motivated practices, rather than being genuinely "of general applicability."

19 *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542-43, 545 (1993).

20 Such is the case here.

21     The Counseling Censorship Law is severely underinclusive as a means toward the goal it

22 purports to serve, triggering each of these concerns. Based on the recitations of the legislative

23 record, the harm that the law purportedly seeks to avoid is the psychic distress to individuals

24 caused by what the State deems to be misguided counsel. (Compl. ⁋ 56-61.) Even if this were a

25 legitimate basis for governmental censorship (it is not), our world–and Washington State–is

26 filled with sexual and relational advice pointing in every conceivable direction, much of which

27 may cause distress to those who follow it. No doubt misguided counseling on other topics (*e.g.*,

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

14

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

recommendations to use hallucinogenic drugs, websites or YouTube videos that encourage minors to adopt transgender identities, or promotion of extreme diets) could equally lead to adverse impacts and distress for some clients. Yet the Washington legislature has not launched a general inquiry into such risks, nor banned "counseling that may lead to psychological distress." Instead, it has exclusively named, targeted, and censored from counseling conversations only a narrow category and a specific viewpoint, defined by current political fashion rather than by any demonstration of unique harm.

> **3.**    **The Counseling Censorship Law cannot survive strict scrutiny because it is not the least-restrictive alternative.**

A law subject to strict scrutiny is also not "narrowly tailored" if the purported interests could have been served by a less restrictive alternative. The government bears the burden to prove that available alternatives would have been ineffective. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000). Where speech which the government considers harmful is at issue, the "least restrictive alternative" is unlikely to involve censorship. "The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *Alvarez*, 576 U.S. at 727. "[M]ore speech, not enforced silence" is the best response to perceived falsehoods or misguided ideas. *Whitney v. California*, 274 U.S. 357, 377 (1927); *see also Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965 (9th Cir. 2009) (California failed to show that an education campaign could not equally serve its asserted interest).

Alternatives in addition to "more speech" were also evident. Washington State could have crafted a voluntary certification program for professionals who agree not to offer counseling of the type the legislature dislikes. *See Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 97 (1977) (government could have used financial incentives, rather than speech restrictions, to advance its interests).

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

15

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

There is no sign that the Washington legislature considered these alternatives. Given the existence of these plausible, less restrictive alternatives to Washington's content-based restriction on speech, the Law is not narrowly tailored. *Playboy Ent. Grp.,* 529 U.S. at 816; *McCullen*, 573 U.S. at 479.

II.     The Counseling Censorship Law Violates the Free Speech Rights of Clients of Plaintiff Tingley.

        A.     Plaintiff has standing to assert the First Amendment rights of his clients.

Mr. Tingley has standing to assert the rights of his clients that are violated by the Counseling Censorship Law. Such standing should be recognized where the party "has a 'close' relationship with the person who possesses the right," and where there is also some "'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). These considerations exist strongly here.

*First*, as a counselor Mr. Tingley has an extremely close relationship with clients who seek his assistance with goals relating to relationships and sexual attractions. (Tingley Decl. ¶ 84.) Counseling conversations relating to such topics are intensely sensitive, intimate, and important for clients, and "candor is crucial." *NIFLA*, 138 S. Ct. at 2374; *see also Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 958 (1984) (fund-raising company may assert free speech rights of client charities, where the protected interest was "at the heart of the . . . relationship between Munson and its clients").

*Second*, there are multiple obstacles here to counseling clients "protect[ing] [their] own interests." As was true in *Eisenstadt*, the Counseling Censorship Law does not prohibit *receiving* counsel, so even while Mr. Tingley's clients are denied access to ideas that they desire to hear, they "are not themselves subject to prosecution and, to that extent, are denied a forum in which to assert their own rights." 405 U.S. at 446.

*Third*, it is extremely difficult or even impossible for these clients to step forward to vindicate their own rights to engage in therapeutic conversations with Mr. Tingley. (Tingley Decl. ¶ 85.) These clients already experience emotional turmoil, and it is hardly speculative to

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

16

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1   predict that putting their personal difficulties into the spotlight of litigation would cause

2   additional anguish and harm. (Tingley Decl. ¶ 86.)

3        Finally, where First Amendment rights are threatened, the rules for representative

4   standing are relaxed. *Joseph H. Munson Co.*, 467 U.S. at 956. Courts find standing "when

5   enforcement of the challenged restriction against the litigant would … indirectly [violate] third

6   parties' rights." *Warth v. Seldin*, 422 U.S. 490, 510 (1975); *see also Va. State Bd. of Pharmacy v.*

7   *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (advertisers may assert readers'

8   right to receive information). This concern is present here.

9        B.    The Counseling Censorship Law violates the First Amendment right of clients of
10            Tingley to receive desired information and counsel.

11       "The right of freedom of speech and press includes not only the right to utter or to print,

12  but . . . the right to receive, the right to read" *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965);

13  *see also Va. State Bd. of Pharmacy*, 425 U.S. at 756 ("[T]he protection afforded is to the

14  communication, to its source and to its recipients both."). Thus, for all the reasons that the Law

15  violates Mr. Tingley's free speech rights, "enforcement of the challenged restriction against [Mr.

16  Tingley] would . . . indirectly [violate] third parties' rights." *Warth*, 422 U.S. at 510.

17  III.   The Counseling Censorship Law Violates the Due Process Rights of Plaintiff Because It
18        Grants Unbridled Discretion in Enforcement.

19       The government is prohibited from imposing or threatening punishment based on a law

20  that is "so standardless that it authorizes or encourages seriously discriminatory enforcement."

21  *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Kolender v. Lawson*, 461 U.S. 352,

22  357-358 (1983) (striking statute that required persons "loitering" on the street to "account for

23  their presence" upon request by an officer). And where an ordinance "interferes with the right of

24  free speech or of association, a more stringent vagueness test should apply." *Holder v.*

25  *Humanitarian Law Project*, 561 US 1, 19 (2010) (citation omitted).

26       The Counseling Censorship Law is unconstitutionally vague on its face in critical

27  respects. First, it provides no standards or guidance to define the line between speech that

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____                    17                  ALLIANCE DEFENDING FREEDOM
                                                                   15100 N. 90th Street
                                                                   Scottsdale, Arizona 85260
                                                                   (480) 444-0020

permissibly seeks to "facilitat[e]" a client's "identity exploration and development," and speech that unlawfully seeks to "change" that person's gender identity or sexual orientation. The boundary between "exploration" and "change" is unknowable. (Cmpl. ¶ 46, 220-221.) Second, critical terms in the Counseling Censorship Law, including "gender identity", "gender expressions", "identity exploration", and "identity development" are undefined in the Law itself, and also undefined in science, and indeed have more in common with slogans than with a fixed standard identifying what counseling speech is prohibited and subject to punishment under the Law, and what is not. (Cmpl. ¶ 45, 222-232.) Third, there is no indication whether the prohibition on any "regime that *seeks* to change . . ." sexual orientation or gender identity refers to the subjective intent of the client, or that of the counselor. (Cmpl. ¶ 47, 233-234.)

These factors combine to afford effectively unbounded discretion to those authorized to bring enforcement actions under the Law. Essentially any exploratory discussion on matters of gender, gender expression, sexual orientation, sexual behaviors, or sexual or romantic attractions could be accused after the fact as a violation of the Law. (Cmpl. ¶ 181; Tingley Decl. ¶ 81.) And just as the Law itself targets a disfavored viewpoint, counselors who share that disfavored viewpoint must fear that they themselves will be targeted, and that the unbounded discretion afforded by the vague statutory language will be used to bring discriminatory and harassing enforcement actions against themselves. (Cmpl. ¶ 177-178; Tingley Decl. ¶ 78.)

This fear is necessarily multiplied by the extraordinary provision of this law which authorizes "*any . . . person*" to bring enforcement actions–potentially including ideological opponents or activists with no connection whatsoever to either the counselor or his client. (Cmpl. ¶ 55). Enforcement power in such hands, "defined" only by undefined terms at the very center of the Law's prohibitions, cannot satisfy the demands of Due Process.

IV.    The Counseling Censorship Law Violates the Free Exercise Rights of Mr. Tingley and His Clients.

For the reasons explained above, the Counseling Censorship Law is unconstitutional as applied to anyone. And it is unconstitutional as applied to Mr. Tingley for the additional reason

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

18

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

that it restricts the religious exercise of Mr. Tingley and his clients. The right to "free exercise" includes not merely the right to believe, but to live one's faith. This includes the right to "the performance of (or abstention from) physical acts," as well as the right to "profess whatever religious doctrine one desires," *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990), along with "communicating" these teachings to others so that they may live according to that faith. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring). Professionals such as counselors do not surrender this "first freedom" by accepting a professional license.

A.    The Counseling Censorship Law violates free exercise rights because it is not neutral.

A law that burdens religious conduct is subject to strict scrutiny unless it is "neutral." *Smith*, 494 U.S. at 879. To assess neutrality, courts start with the law's text and its effect "in its real operation." *Lukumi*, 508 U.S. at 532-36. Here, the targeting is in plain view. As detailed in the Complaint, it is well known that counseling of the type the legislature has tarred as "conversion therapy" is principally sought by religiously motivated clients, provided by counselors who share similar religious convictions, and is both sought and provided for the purpose of bringing feelings and/or behaviors into line with faith-based views of human nature, morals, and a life well lived. (Cmpl. ¶¶ 62-68.)

For example, the 2009 task force of the American Psychological Association reported that "most [sexual orientation change efforts or "SOCE"] currently seem directed to those holding conservative religious and political beliefs, and recent research on SOCE includes almost exclusively individuals who have strong religious beliefs." (Emphasis added) (Cmpl. ¶ 67.) A 2013 statement issued by the American Counseling Association asserted that "conversion therapy . . . is a religious . . . practice." (Cmpl. ¶ 63.) And in the important 2016 paper quoted above, Prof. Lisa Diamond and Prof. Clifford Rosky cited multiple peer-reviewed papers to conclude that "the majority of individuals seeking to change their sexual orientation report doing so for religious reasons rather than to escape discrimination." (Cmpl. ¶ 68.)

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

19

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

Thus, as has been known for more than a decade, it is people of faith who are standing where the legislature has chosen to target. This is not neutrality; this is hostility. Under *Smith* and *Lukumi*, strict scrutiny must be applied. For all the reasons reviewed above, the Counseling Censorship Law cannot survive that rigorous test. *See supra* at p. 11-16.

B.   The Counseling Censorship Law violates free exercise rights regardless of whether it is "neutral and of general applicability."

While satisfying the *Smith* test is necessary to justify a law that restricts free exercise, it is not always sufficient. The Supreme Court has expressly rejected the idea "that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017). In *Hosanna-Tabor*, 565 U.S. at 182-187, for example, the Court unanimously barred application of a neutral and generally applicable employment discrimination law against a religious school, on free exercise grounds, without applying the *Smith* test. Notably, the Court has *never* applied the *Smith* test to permit censorship of faith-motivated speech because the government dislikes the purpose or message of that speech.

Questions about the nature of men, women, sexuality, sexual relations, and marriage—what will lead toward a whole life and what will not—have been a central concern of religions including at least Judaism, Christianity, and Islam since ancient times. Teaching and counsel directed to a right ordering of one's relationship to one's body and gender, and to sex, marriage, and family, are central to the content and propagation of religious faith. For this reason, notwithstanding *Smith,* the First Amendment flatly denies Washington State the power to tell a Christian that he cannot seek the help of a trusted counselor to pursue a path of conduct in his life consistent with his faith. Nor can it tell Mr. Tingley that he cannot provide counsel that is informed by and consistent with his own faith and that of his client concerning sexuality and personal identity.

Perhaps coming at the same point by a different route, the hybrid rights exception expressly carved out by the Supreme Court in *Smith* likewise dictates that the Counseling

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

20

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

Censorship Law—as applied to Mr. Tingley and his faith-motivated clients—must undergo strict scrutiny regardless of whether it is "neutral and generally applicable," because it implicates *both* free exercise and free speech rights. *See Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999) (noting that *Smith* "excepts a hybrid-rights claim from its rational basis test"). In order to invoke that exception, the plaintiff must demonstrate only a "fair probability" or "likelihood" but not "certitude" of success on the companion claim. *Miller*, 176 F.3d at 1207 (cleaned up). The Plaintiff here has surpassed this marginal threshold, *see supra* at p. 7-11, so strict scrutiny applies—and is fatal. *See supra* at p. 11-16.

V.   <u>The Remaining Factors Favor Granting a Preliminary Injunction.</u>

For all the reasons reviewed above, Plaintiff Tingley has demonstrated likelihood of success on the merits. Once a likelihood of success in establishing a First Amendment violation has been established, no separate "balance of equities" analysis is necessary to conclude that a preliminary injunction should issue. (*See supra* at p. 7.) The violation of First Amendment rights of Mr. Tingley and his clients constitutes irreparable harm, and the State of Washington has no cognizable interest in preventing the "harms from ideas" to citizens that the Counseling Censorship Law purports to avert. (*See supra* at p. 12-13.)

### Conclusion

For the reasons set forth above, Plaintiff Brian Tingley respectfully requests that this Court issue a preliminary injunction prohibiting any enforcement action both facially and as-applied against Plaintiff under the Counseling Censorship Law pending entry of a final order in this case.

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

21

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

1    Respectfully submitted this 13th day of May, 2021.

2

3    By: s/ Gregory D. Esau                    By: s/ Kristen K. Waggoner

4      Gregory D. Esau (WSBA #22404)              Kristen Waggoner (WSBA #27790)
       ELLIS | LI | MCKINSTRY                     Roger G. Brooks* (NC Bar #16317)
5      1700 Seventh Avenue, Suite 1810           ALLIANCE DEFENDING FREEDOM
       Seattle, WA 9810                          15100 N. 90th Street
6      206-682-0565 (T)                          Scottsdale, AZ 85260
       gesau@elmlaw.com                          480-444-00204 (T)
7                                                480-444-0028 (F)
                                                 kwaggoner@adflegal.org
8                                                rbrooks@adflegal.org

9
                                                 David A. Cortman* (GA Bar #188810)
10                                               ALLIANCE DEFENDING FREEDOM
                                                 1000 Hurricane Shoals Rd. NE
11                                               Ste. D-1100
                                                 Lawrenceville, GA 30043
12                                               (770) 339-0774 (T)
                                                 (770) 339-6744 (F)
13                                               dcortman@ADFlegal.org

14
                                                 *Pro Hac Vice applications filed concurrently
15

16
                                                 Attorneys for Plaintiff
17

18

19

20

21

22

23

24

25

26

27

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____                    22                    ALLIANCE DEFENDING FREEDOM
                                                                      15100 N. 90th Street
                                                                   Scottsdale, Arizona 85260
                                                                        (480) 444-0020

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system. The foregoing document will be served via private process server with the Summons and Complaint to all Defendants.

DATED: May 13, 2021

s/ Kristen K. Waggoner

Kristen Waggoner (WSBA #27790)
Roger G. Brooks*(NC Bar #16317)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020 (T)
480-444-0028 (F)
kwaggoner@adflegal.org
rbrooks@adflegal.org

*Attorney for Plaintiff*

Plaintiff's Mot. for Prelim. Inj. and
Mem. in Supp.
Case No. _____

23

ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020