UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

**BRIAN TINGLEY**,

Plaintiff,

v.

**ROBERT W. FERGUSON**, in his official capacity as Attorney General for the State of Washington; **UMAIR A. SHAH**, in his official capacity as Secretary of Health for the State of Washington; and **KRISTIN PETERSON** in her official capacity as Assistant Secretary of the Health Systems Quality Assurance division of the Washington State Department of Health,

Defendants.

Civil No. 3:21-cv-5359

**DECLARATION OF BRIAN TINGLEY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Brian Tingley, declare as follows:

1. I am a licensed Marriage and Family Therapist in the State of Washington. I live in Washington State, and practice in Fircrest, Washington. I obtained a Master of Science in Marriage and Family Therapy from Seattle Pacific University in 2001.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

2. I am an Approved Supervisor by the State of Washington and the American Association for Marriage and Family Therapy, as well as a Clinical Fellow Member of the American Association for Marriage and Family Therapy.

3. I founded my own private counseling practice in 2002, and since that time have offered a wide range of counseling services to adolescents, adults, couples, and families, addressing interpersonal and family conflict, communication issues, marital and post-divorce issues, emotional management including depression and anxiety, anger and stress management, and adult Attention Deficit Hyperactivity Disorder, among many other matters. Distress and struggles relating to gender identity and sexual attractions and behaviors are some of the many issues about which clients ask for my assistance. I also have experience in crisis intervention and have worked alongside child protective services and law enforcement where children have been placed in protective custody.

4. I have taught college courses in Psychology and Human Relations, and have facilitated training seminars and workshops at the request of local therapist groups.

5. I have provided both in-person and written testimony to the Washington State Legislature on issues pertaining to teenage sexuality and identity on several occasions, including in connection with the bill that was ultimately passed as the Counseling Censorship Law.

6. I have been a committed believer in the Christian faith for many years. I received a Diploma in Ministry and Biblical Studies in 1984. I am regularly asked to provide seminars and workshops to local churches on challenges facing children and families that take into account a biblical perspective as well as my professional expertise.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

A. <u>Practice and counseling methodology</u>

7. I work with both Christian and non-Christian clients, including clients from a different faith background or no faith at all. I approach counseling of any clients who choose my services in a consistent way.

8. As a general practitioner, I encounter in my clients a wide scope of the emotional, family, relational, and mental difficulties to which members of any human community are vulnerable. In this regard, my practice is similar to that of any general practice counselor. However, on our website our practice group identifies itself as a "group of Christian providers" who assist clients to pursue "personal and relational growth as well as healing for the wounded spirit, soul, and body through the healthy integration of relational, psychological, and spiritual principles with clinical excellence." Many of my clients are referred to me by local churches, and the majority of my clients share my Christian faith. Many of my clients tell me that they have chosen to come to me precisely because they want to speak to a counselor who shares and respects their Christian beliefs and worldview about the issues that are affecting their lives.

9. While I never impose my Christian faith on anyone, my faith informs my understanding of human nature, healthy relationships, and what paths and ways of thinking will be most likely to enable my clients to achieve comfort with themselves and live happy and satisfied lives.

10. I am not a pastor, and do not consider it part of my role as a counselor to rebuke or pass moral judgment on my clients, to tell them that how they are feeling or what they are doing is wrong, nor to tell them how they should live their lives. Instead, my counseling approach is to provide a safe environment for each client to allow for his or her own self exploration. My first priority is ensuring that I establish trust with my clients, so that they feel safe in opening up to discuss all kinds of sensitive issues. Once rapport is established, I can help the client to

identify his or her own objectives and then, through discussion over time, work together to accomplish those objectives.

11. Because I am Christian myself, I am able to engage with my Christian clients in a manner that is particularly understanding and respectful of, and informed by, faith convictions and personal goals of the client that are guided by the client's faith convictions, or by the client's desire to live a life of integrity in his or her family and relationships.

12. In my experience, where clients have a strong faith, it can be of particular importance to them to know that there are no unspoken concerns or suspicions about their beliefs on the part of their counselor. This is because of the central role that faith plays in their lives—touching on all aspects of their life—as well as their prior life experience of varying degrees of opposition to their faith from those who do not share their beliefs.

13. Working with my clients, all I do is sit and talk with them. I spend time listening to their stories, their fears, and their hopes—at times probing with questions to aid their own self-discovery. This process allows clients to reflect on their identity and their beliefs, as well as enabling them to identify personal goals and objectives which may not have been clear to them when they began this process.

14. In this process, I see my role as that of an encourager and facilitator, walking alongside my client to provide support, to challenge, and to provide feedback on the road they have chosen. I work with them to overcome or change mental, emotional, or relationship issues that they identify, and to achieve stability. Ultimately, my goal as a professional counselor is to help my clients achieve the lives and the personal goals that they have set out for themselves based on their own beliefs and wishes.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

15. I work only with willing clients—clients who voluntarily and willingly talk with me about their problems, thoughts, and concerns.

16. No client has ever filed any complaint against me relating to any counseling that I have provided, related to any issue of gender identity, sexual attraction, sexual behaviors, or any other topic.

17. Given my expertise and my family-oriented practice, a significant part of my practice is dedicating to counseling minors. I work with minors on a wide variety of issues as they transition into adulthood, but my basic approach to them as clients remains the same as I have described above. That is, I seek to offer minors a listening ear and the support and encouragement that they need to achieve goals and objectives that they set for themselves.

18. In most cases a minor will initially come to my office brought by and at the prompting of his or her parent or parents. However, I will only continue to see a minor as a client if the minor is willing to work with me, and participates voluntarily.

19. I counsel minors who are struggling with a very wide range of problems, including depression, anxieties, stress, anger, insecurity, and lack of purpose or direction. Topics about which I have counseled minors also include concerns or confusion about gender identity, unwanted same-sex attraction, and other unwanted sexual behaviors such as addiction to pornography.

20. In these cases, as with any other, I do nothing but talk with my clients. I simply listen to what they are willing and able to share, ask them questions, and talk with them.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

B. Faith-based beliefs concerning gender, sex, sexual conduct, and the possibility of change

21. The majority of clients who seek my assistance to reduce unwanted same-sex attraction and develop or increase opposite-sex attraction are motivated at least in part by a desire to live in accordance with the teachings of their faith.

22. These individuals believe that it is more important to live consistently with their religious values than to conform their lives to their subjective feelings. Because I share that faith and those convictions, I am able to provide counsel that understands, respects, and assists these clients towards their goals.

23. Many Christians, including many of my clients, hold similar beliefs, grounded in biblical teachings, about personal identity, self-worth, what it means to live life well, sexual activity and relationships between the sexes, the importance of obedience to God's law, and the possibility of change in both feelings and actions. These beliefs often have great influence on how Christians understand themselves, what they want their lives to look like, and what personal goals they set for themselves.

24. Both my clients' personal goals and my counsel are often informed by these beliefs that are grounded in our shared Christian faith and acceptance of biblical teachings.

25. While I have modest theological training, I am not a theologian. However, I will summarize some of these beliefs as I understand and hold them.

26. *First*, Christians believe that the division of the species into male and female is not a minor detail or accident, but is a wonderful fact of humanity, and integral to our very being. As it says in the Book of Genesis, "in the image of God He created them; male and female He created them. . . . and it was very good." (Genesis 28-31.)



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

27. *Second*, Christians believe that the sex—male or female—that each of us receives from the moment of conception, is a gift. It is not an accident, an insignificant detail, a problem, or a potential mistake. Each of us is individually known and intended by God even before we are conceived: "Before I formed you in the womb I knew you" (Jeremiah 1:5). Each child is "the work of [God's] hands" (Isaiah 29:23), made according to God's purpose: "For you created my inmost being; you knit me together in my mother's womb." (Psalm 139:13.) And each of us is so "fearfully and wonderfully made" that we should be moved to rejoice and give thanks. (Psalm 139:14.) Thus, many Christians believe, as a teaching of their faith, that obedience, well-being, and happiness for each of us will include acceptance of and gratitude for the particular sex that God has given us.

28. *Third,* Christians believe that the joining of male and female in marriage to conceive children and raise up each next generation is a great blessing, a great calling, and a sacred thing. Thus, God's first instruction and "blessing" to Adam and Eve was that they should "Be fruitful, and increase in number." (Gen 1:29.) The Apostle Paul taught that the children of believing parents are themselves "holy." (1 Corinthians 7:14.) And the Book of Deuteronomy imposes on parents the high duty of instructing the next generation in the truths and law of God: "You shall teach them diligently to your children, and shall talk of them when you sit in your house, when you walk by the way, when you lie down, and when you rise up." (Deuteronomy 6:7.)

29. *Fourth*, many Christians believe that sexual relationships belong only between man and woman, and only within marriage. Thus, the Apostle Paul taught that "among you there must not be even a hint of sexual immorality." (Ephesians 5:3.) Of course, one aspect of this "law" has been embodied since ancient times in the Ten Commandments, which include the commandment that "You shall not commit adultery." (Exodus 20:14.)



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

30. *Fifth,* Christians believe that we are to obey God's laws and instruction *regardless* of conflicting desires or feelings we may have. Jesus told his disciples, "Anyone who loves me will obey my teaching." (John 14:23.) Peter emphasized that "We must obey God rather than human beings." (Acts 5:29.) And Paul taught that we must choose between being "slaves to sin, which leads to death, or to obedience, which leads to righteousness." (Romans 6:16.) For example, we are commanded not to commit adultery *regardless* of what desires we may feel, and regardless of how "right" it might seem to us. Our often-misguided desires do not define what is right or healthy for us, and should not define who we are.

31. *Finally*, and absolutely critically, Christians believe that change that aligns our heart with God's will is *always* possible by God's power, however difficult it may seem. Long before Christ, the prophet Ezekiel declared God's promise that "I will give you a new heart and put a new spirit in you." (Ezekiel 36:26.) Jesus, speaking of a deeply difficult heart change, told his disciples that 'With man this is impossible, but not with God; all things are possible with God.'" (Mark 10:27.) And Paul urged believers to "be transformed by the renewing of your mind" (Romans 12:2), and promised that "if any man be in Christ, he is a new creature: old things are passed away; behold, all things are become new" (2 Cor. 5:17).

32. In sum, Christians do not believe that we are *ever* irrevocably trapped and our identity defined by desires and feelings that are in conflict with God's instructions. With God's help, change is always possible.

33. The Counseling Censorship law appears to be premised on a belief that change in areas of sexual orientation, sexual behaviors (an extremely expansive term), or gender identity is either impossible or undesirable.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

34. Based on both my religious conviction and my own professional experience and discussions with colleagues over the years, I believe that the Washington legislature is mistaken in its understanding of human nature, and the Christian teachings and convictions concerning the possibility of change that I have summarized above are correct.

35. If a client seeks my assistance in reducing unwanted same-sex attraction and developing or increasing opposite-sex attraction, I cannot—consistent with my conscience, my religious convictions, or my general client-oriented approach to psychotherapy—counsel that individual that such change is impossible, or that the individual should not pursue it. My Christian faith teaches exactly the opposite.

36. For human, professional, and religious reasons, I desire to continue to help both current and future clients who request my help to enable them to change their sexual attractions by reducing unwanted same-sex attraction and developing or increasing opposite-sex attraction.

C. Counseling of minors suffering from gender dysphoria

37. I have worked with minors who may be suffering from gender dysphoria as clinically defined in DSM-5, and who express discomfort with their biological sex and are struggling with questions and feelings around their gender identity.

38. In one incidence since the enactment of the Counseling Censorship Law, parents brought their teenage minor daughter who had been exposed to websites advocating transgender identification for girls, and who had begun expressing unhappiness with her female gender identity, and even asserting a male gender identity. This girl had been previously diagnosed with high-functioning autism and was facing various social difficulties at school with her peers. In earlier



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

years, according to the parents, she had appeared comfortable in her identity as a girl.

39. The parents were aware that gender dysphoria is often accompanied by mental health co-morbidities, that gender identity in young people is not necessarily fixed, and that long-term adoption of a transgender identity by their daughter would likely lead to sterilization, lifelong dependence on extraordinary medical care including cross-sex hormones, and an increased risk of physical, social, and mental health difficulties.

40. As Christians, the parents also believed that God had created their daughter female, and that she would therefore find the path to a happy and fulfilling life by learning to accept herself as the girl and future woman that God had made her.

41. The parents' desire was thus to find a counselor who would assist their daughter in understanding herself and exploring the reasons for her unhappiness with her sex and identity as a girl, and hopefully enable her to return to comfort with her female body and reproductive potential, and with a gender identity as a female, girl, and in years to come, woman.

42. The parents expressed these thoughts and goals to me, and sought my professional expertise as a counselor to work with their daughter towards that goal. The daughter also expressed a willingness to meet and talk with me. Accordingly, I entered into this counseling relationship, taking the girl on as a client.

43. My counseling of this client mainly consisted of private discussions, consisting for the most part of prompting questions, and sympathetic listening. It also included discussions with the girl and her parents together.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

44. At no point did my client indicate that she was talking with me against her will, or that she felt that I was coercing her in any manner. Instead, she actively participated in talking and sharing her feelings and worries with me.

45. After several counseling sessions, this minor client expressed a desire to become more comfortable with her biological sex, notwithstanding her previous claims of a male gender identity. I did not tell her that such change is impossible or undesirable—both of which I believe to be false. Instead, I worked with her toward that goal. Over the course of several years of observing and talking with this girl, I saw a notable improvement in her demeanor and self-esteem. Based on things that both she and her parents told me, I understood that she was more comfortable identifying herself as a girl, and seemed to be much happier with her direction in life.

46. Another recent instance occurred when a Christian family came to me after their minor daughter had begun expressing discomfort with her biological sex and asserting a male gender identity. This girl had exhibited no signs associated with gender dysphoria as a young child, but had begun to assert a transgender identity only after exposure to online material advocating transgender identification.

47. As with the parents I described above, this girl's parents were aware that gender dysphoria is often accompanied by mental health co-morbidities, that gender identity in young people is not necessarily fixed, and that long-term adoption of a transgender identity by their daughter would likely lead to sterilization and lifelong medical complications.

48. These parents also sought a counselor who would assist their daughter in understanding herself and exploring the reasons for her unhappiness with her sex and identity as a girl, and hopefully enable her to return to comfort with her

female body, and with a gender identity as a female, girl, and in years to come, woman.

49. However, while the parents of this minor client expressed their faith-based hopes and goals for their daughter's counseling regarding gender identity, they also discussed the Counseling Censorship Law with me. They expressed great fear about what being accused of being involved in a violation of that Law might do to their family, including their fear that it could lead to the intrusion of Child Protective Services between themselves and their daughter.

50. As the daughter was willing to meet and talk with me, I agreed to work with her as a client. However after a few sessions, without expressing any dissatisfaction with my counseling, the parents terminated the counseling relationship. It was my impression that the parents could not get over their fear of what might happen to their family if they were accused of bringing their daughter for counseling that violated the Counseling Censorship Law.

51. I have now supported several adolescent clients in similar circumstances who have sought my help in addressing questions and concerns surrounding their gender identity. In some of those cases, during counseling the clients have specifically expressed their desire to accept and achieve comfort with their God-given sex as a motivation for their goals in counseling. In other cases, neither the parents nor the minor client have expressed any religious motivation for their goal that the minor achieve comfort with an identity that corresponded to his or her biological sex.

52. Many sources report that the number of children and teens experiencing gender dysphoria and/or experiencing an attraction to a transgender identity has increased greatly over the last decade. I have seen this issue arise with



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

increasing frequency in my own practice. As a result, I expect with great confidence that other minor clients will seek my assistance in dealing with gender dysphoria and gender identity issues in the months and years ahead. Given the deep distress that these children and their families experience, it is my strong desire to provide such counseling for minors who are willing to engage with me in such conversational counseling on a strictly voluntary basis.

D. Counseling relating to sexual orientation

53. Over the years, I have had multiple clients, including minor clients, who experienced unwanted same-sex attraction and desired my help in reducing those attractions so that they could successfully enter into heterosexual romantic relationships, and also so that they could live in a manner consistent with the moral teachings of their Christian faith.

54. While I share the widely held professional view that changing sexual attraction is often difficult, it is my professional opinion that this is a topic on which scientific knowledge is far from complete, on which professionals can and do have a host of good-faith disagreements, and in which it is therefore all the more essential—for the good of clients—that an uninhibited discussion of ideas, therapies, and professional experiences continue.

55. Both my understanding of human nature as informed by my faith, and my own professional experience, lead me to believe that change in sexual attractions is possible and does occur.

56. Conversations with colleagues as well as published reports from other practitioners over many years, have confirmed to me that it has been their experience, also, that some clients who are strongly motivated to reduce same-sex attraction and achieve stable opposite-sex attractions and relationships, and who obtain professional counseling to assist them, do succeed in achieving those goals.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

57. While client confidentiality precludes disclosing details, I am currently providing counseling to multiple minor teens who have experienced unwanted same-sex attraction, and who have asked me to work with them towards a personally chosen goal of seeking to change the attractions they experience by reducing or eliminating same-sex attraction, and increasing a sense of attraction to the opposite sex. I am willing to, and currently do, provide counseling to these clients to help them achieve their goals.

58. For example, in recent years I counseled an older teen on this topic. This teen's parents first brought him to my office, but over time, this client himself has sought my counsel on a number of topics including attraction to pornography and unwanted same-sex attractions.

59. Like many young people, this individual first fell into a pattern of repeated access to online pornography. In time, he encountered online pornography depicting same-sex conduct, and believes that this pornography stirred up same-sex attractions in himself that he did not previously experience and would never have experienced had he not been exposed to this pornography.

60. The client has a personal Christian faith, and desires to live his life in accordance with what he understands to be the teachings of his faith. He is of the opinion that he will flourish—spiritually, emotionally and in relationships—through obedience to the teachings of his faith. He believes that his faith in God is a personal priority over his sexual attractions, and that God has determined his identity according to the body he was given and what is revealed in the Bible, rather than his own desires and perceptions.

61. For this reason, the client asked me to provide counseling to help him achieve his personal goal of reducing his same-sex attractions and strengthening his attraction to women.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

62. I never promise clients that I will be able to solve the problems they bring to me, and made no such promises to this young man. However, I have provided and continue to provide sympathetic counseling that is respectful of the client's faith and his personal goals and desires. Through ordinary techniques of counseling, including caring listening and questions to help the client understand himself and his personal history, I am supporting this client as he works towards the change he desires to see in his own life. And indeed this particular client tells me that he feels that he has made, and is making, progress towards his goals.

63. The experience of this client is not unique. Over the years, I have worked with several minors—both male and female—who have revealed similar thoughts and circumstances, and have sought my help in reducing same-sex attractions and developing their sense of attraction to the opposite sex. Often, these young people's experiences of same-sex attraction are associated with pornography use.

64. Some former clients who sought my counseling aid on this topic as minors achieved their goals, and as adults are now living stable and happy lives in heterosexual marriages.

65. Based on my many years of experience, I expect that additional minor clients experiencing similar distress, and sharing similar life goals, will continue to seek my counseling assistance towards those goals in the months and years ahead.

66. In counseling clients who desire to decrease same-sex attraction or increase their attraction to the opposite sex, I do nothing except talk with my client, offering ways of thinking about themselves and others that may help them make progress towards the change they desire. I do not use electro-shock therapy. I do not recommend that clients view pornography of any sort. I do not recommend that clients subject themselves to painful or other adverse stimulations in response to undesired sexual thoughts.

E. Counseling relating to sexual "behaviors"

67. From time to time I also work with minor teens who have expressed a desire to desist from ongoing sexual behaviors which they consider harmful to themselves and inconsistent with their religious beliefs about sexual morality.

68. Several minor clients have sought my help to break out of a pattern of frequent viewing of pornography for sexual gratification. For example, I recently worked with a minor who came for counseling after his mother had initially sought help for him. The client had become obsessed with watching pornography, and despite the efforts of the mother to restrict access to computers and the internet, the client would still find ways to get online and view pornography.

69. This client came from a Christian home and attended church regularly. During our discussion, the client said that he did not like the fact that he was so drawn to pornography, and personally expressed the belief that it is wrong to look at pornography. He further expressed feeling out of control in his viewing of pornography, and told me that he wanted to stop. I worked with the client towards a goal of ending his regular viewing of pornography, and the client made good progress towards that goal during the time that our counseling relationship continued.

70. Unfortunately, pornography addiction is a common problem among young people today thanks to easy access through the internet. I have supported other clients in similar circumstances who have asked my counseling help to assist them to stop viewing pornography because they believe it to be wrong and unhealthy for them to engage in.

71. I have also worked with clients who have wanted to cease engaging in sexual activities that they believe are wrong. One example occurred with a teenage client who initially came to me because he was experiencing academic difficulties and loss of focus at school. This young man was a Christian, involved with his



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

church youth group and with church mission trips to serve other communities. After several counseling sessions, the client on his own initiative raised concerns about the way in which he viewed girls, and in particular his ongoing sexual relationship with his girlfriend.

72. The client believed that it was not right for him to be sexually active with his girlfriend, and felt that his thoughts and behaviors were in conflict with his faith and morals. He expressed frustration that he repeatedly fell into conduct that he believed was wrong and harmful to both himself and his girlfriend, and expressed a desire to align his sexual thoughts and actions with his faith. I worked with this young man to help him change the thoughts, actions, and lack of self-control that were distressing him, as part of a wider effort on the part of the client to become a more healthy and stable individual. Over time, I observed the client becoming happier, with better self-esteem and drive, as he addressed these behaviors that he believed to be wrong and harmful.

73. Based on my experience and my understanding of adolescents and teens, I expect with high confidence that minor clients will continue to seek my counseling assistance to change sexual behaviors that they believe are harmful and inconsistent with their personal life goals and religious convictions.

F. The impact of the Counseling Censorship Law on my practice and clients

74. For professional, religious, and human reasons, I wish to continue to support current and future clients who seek my help with issues relating to gender identity, sexual attractions, and sexual behaviors.

75. In my understanding, the Counseling Censorship Law seeks to prevent me from providing counsel in these areas that my clients desire, that is consistent with their own religious beliefs and with mine, and that is consistent with my



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

professional judgment as to what path will lead these clients into healthy, fulfilled, and stable lives over the long term.

76. When I provide such counsel, the Counseling Censorship Law threatens me with harassment, investigation, and severe penalties potentially including the loss of my license and my livelihood.

77. As a result, when a client raises concerns or goals relating to any of these subjects with me, I cannot help wondering whether at some point in the future the client might file a complaint against me, and I cannot help fearing the possible implications for me and my ability to support my family if that happens.

78. Given how politicized this issue is, I also cannot help fearing that hostile activists will maliciously and dishonestly present themselves as clients in an effort to entrap me and accuse me of violating the Counseling Censorship Law. Similarly, even in the case of a client who seeks my assistance in good faith, and who appreciates and values my counsel, I cannot avoid fearing that some other individual—even a completely unrelated individual—will learn of the nature of such counseling and from ideological motivations will file a complaint against me, or even initiate a third-party enforcement action against me, as is authorized by the Counseling Censorship Law.

79. Merely going through an investigative process if accused of a violation of the Counseling Censorship Law—likely accompanied by hostile and uninformed publicity—would be extremely stressful and disruptive of my practice and livelihood, regardless of whether a violation was ultimately found.

80. In practice, these well-founded fears mean that my conversations with clients on matters of gender, gender expression, sexual orientation, sexual behaviors, or sexual or romantic attractions—particularly at the outset of



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

conversations with a new client, or when these issues are first raised by an existing client—are inevitably more guarded and cautious than would otherwise be the case. Yet openness, candor, and trust are essential to a successful counseling relationship.

81. In fact, because the terms used in the Counseling Censorship Law to define what is prohibited are so broad and undefined, I must and do fear that someone could later accuse me of a violation of the Law based on almost any exploratory discussions I might have with clients on matters of gender, gender expression, sexual orientation, sexual behaviors, or sexual or romantic attractions. Since these are common matters of concern for troubled teens, this amounts to serious interference with my counseling conversations.

82. Not only does the Counseling Censorship Law chill discussions that I have with my clients, but it also makes it too hazardous for me to actively publicize my willingness to work with minors on these issues (for example, on our practice website), as I would otherwise like to do.

83. Furthermore, to counsel clients on these topics without running a substantial risk of violating the law, I would have to counsel and speak to my clients on the premise that seeking to reduce same-sex attraction, or to achieve comfort with their biological sex, could not be successful, and would instead harm their physical and psychological well-being. In my opinion, the law is designed to compel me to speak to my clients and conduct my counseling in a manner that reflects those beliefs. Not only are these viewpoints directly contrary to my beliefs and the beliefs of many of my clients, but they are also contradicted by science and by the experience of many of my clients.

84. In any successful counseling relationship relating to the sensitive and important topics of sexual attractions, behaviors, and orientation, openness and



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

candor is crucial, and I necessarily enter into an extremely close and intimate relationship with clients who seek my assistance to pursue personal goals in these areas.

85. Often, my clients feel that their discussions with me about sexual attractions, behaviors, or orientation involve the most intimate, difficult, important, and embarrassing topics in their lives. If anything, this is all the more true of teenage clients. Because of this, it is extremely difficult or even impossible as an emotional and social matter for these clients to step forward publicly to assert their own constitutional rights to talk with the counselor of their choice about the topics and personal goals of their choice.

86. These clients already experience serious emotional turmoil, and in my judgment their mental health could be harmed by adding the publicity and adversarial struggle of litigation.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed on April 26, 2021.

By: [signature]
Brian Tingley

Subscribed and sworn to before me this 26 day of April, 2021.

Terry Wyatt
Notary Public, State of WA
My Commission expires 9/2/2024

TERRY WYATT
Notary Public
State of Washington
Commission # 186778
My Comm. Expires Sep 2, 2024



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020